**Nollie Lee MARTIN, Petitioner,**

v.

**Richard L. DUGGER, Secretary, Florida Department of Corrections, Respondent.**

No. 87–8816–CIV.

United States District Court, S.D. Florida, Miami Division.

June 1, 1988.

Larry Helm Spalding, Mark E. Olive, Office of the Capital Collateral Representa-

tive, Tallahassee, Fla., Julius L. Chambers, Richard H. Burr, III, NAACP Legal Defense Fund, New York City, Professor Bruce Rogow, Nova University School of Law, for petitioner.

Joy B. Shearer, Asst. Atty. Gen., West Palm Beach, Fla., for respondent.

ORDER DENYING WRIT OF HABEAS CORPUS WITH RESPECT TO CLAIMS I, III, AND IV AND ORDERING AN EVIDENTIARY HEARING TO RESOLVE THE ISSUES RAISED IN CLAIM II.

JAMES LAWRENCE KING, Chief Judge.

Nollie Lee Martin, currently under a sentence of death, petitions this court for a writ of habeas corpus to expunge both his conviction for first degree murder and his capital sentence. The court stayed Martin's execution on November 10, 1987, in order to address several constitutional issues of first impression in a thoughtful and reasoned manner. These issues are

(1) whether Florida failed to consider nonstatutory mitigating circumstances as required by *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Hitchcock v. Dugger,* — U.S. —, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (hereinafter referred to as the *Hitchcock* claim or claim I);

(2) whether Martin is presently incompetent to be executed under *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (hereinafter referred to as the *Ford* claim or claim II);

(3) whether the burden of proving insanity was unconstitutionally shifted to him in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (hereinafter referred to as the *Sandstrom* claim or claim III);

(4) whether Martin's appellate counsel's failure to raise on appeal Martin's absence from part of the voir dire was ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (hereinafter referred to as the *Strickland* claim of claim IV).

The court denies a writ of habeas corpus with respect to claims I, III, and IV, but orders an evidentiary hearing to resolve the issues raised in claim II. The court reaches these conclusions after reviewing the historical background of this case, considering whether any procedural doctrines should limit this court's jurisdiction, and examining the *Hitchcock* and *Ford* claims in detail.

## I. STATEMENT OF THE CASE

In the late evening or early morning of June 25/26, 1977, Patricia Greenfield, a college student, was robbed at knifepoint at her job as a convenience store clerk by Gary Forbes and petitioner, Nollie Lee Martin. After the robbery, the two men kidnapped Patricia Greenfield and drove her to petitioner Martin's apartment, blindfolded her, and each man forcibly raped her. Still blindfolded, the victim was transported from the apartment and assured that she would be released at a remote area. After aimlessly driving for some distance, the automobile arrived at the vicinity of the city dump, Lantana, Florida. Nollie Lee Martin walked the victim out of the car and away from the view of codefendant, Gary Forbes. Forbes testified that Martin, when he returned to the car, told Forbes that he attempted to first strangle Patricia Greenfield with a short piece of rope, but that she recovered her breath after each attempted strangulation. Martin then stated that he stabbed Patricia Greenfield several times in the throat. The autopsy confirmed that Patricia Greenfield had died of the stab wounds to the throat, and that evidence of a struggle existed.

Nollie Lee Martin was tried before a jury and convicted on all counts in April of 1978. In May of 1978 the second phase of the trial was conducted, and the jury recommended death. On November 13, 1978, Circuit Judge Marvin Mounts, Jr. followed the jury's recommendation and entered a sentence of death. The Supreme Court of Florida, which automatically reviews death sentences, affirmed the convictions and

sentences on September 9, 1982. *Martin v. State*, 420 So.2d 583 (Fla.1982). The United States Supreme Court denied certiorari review. *Martin v. Florida*, 460 U.S. 1056, 103 S.Ct. 1508, 75 L.Ed.2d 937 (1983). On August 18, 1984, the governor of the state of Florida signed the first death warrant for the execution of Nollie Lee Martin. This prompted the filing of a motion for postconviction relief pursuant to Fla.R. Crim.P. 3.850, which was denied. The Florida Supreme Court affirmed the denial. *Martin v. State*, 455 So.2d 370 (Fla.1984).

The petitioner then filed his first federal habeas petition in this United States District Court for the Southern District of Florida, No. 84–8426–Civ–King. This court denied the petition for habeas relief and was affirmed by the Eleventh Circuit Court of Appeals. *Martin v. Wainwright*, 770 F.2d 918 (11th Cir.1985). The Supreme Court of the United States denied certiorari. *Martin v. Wainwright*, —— U.S. ——, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).

On October 21, 1986, the governor of the state of Florida signed the second death warrant for the execution of Nollie Lee Martin. On November 12, 1986, Martin filed an original habeas petition in the Florida Supreme Court seeking a stay of execution. Martin raised seven issues including one that he was incompetent to be executed and that Florida had no constitutionally permissible procedure to determine competency. The Florida Supreme Court dismissed the petition, but directed Martin's counsel to follow the newly promulgated Fla.R.Crim.P. 3.811.

After Martin followed these procedures, the Supreme Court of Florida vacated its previously entered stay of execution on November 10, 1987. On the eve of his scheduled execution, Nollie Lee Martin filed what was in essence his second habeas petition before this court (Martin had previously filed an unripe petition, which this court dismissed on October 28, 1987 without reaching its merits). This court stayed

the execution and now addresses the issues raised in the petition.

## II. PROCEDURAL BARS

Because this is Martin's second federal habeas petition, this court must consider whether to exercise jurisdiction over these claims or rely on principles of judicial economy and comity and refuse to adjudicate the merits of the petition. In 1984, this court considered at length eight separate arguments, all hinged on alleged violations of Martin's constitutional rights at his trial and sentencing. Currently, Martin raises four additional challenges to his conviction and imposed punishment.

The principles of *res judicata* do not apply to habeas proceedings. *Sanders v. United States*, 373 U.S. 1, 7–8, 83 S.Ct. 1068, 1072–73, 10 L.Ed.2d 148 (1963). Accordingly, the Great Writ *habeas corpus ad subjiciendum*, "the most celebrated writ in English law," *Fay v. Noia*, 372 U.S. 391, 399–400, 83 S.Ct. 822, 827–828, 9 L.Ed. 2d 837 (1963), has been subject to abuse. *See generally Woodard v. Hutchins*, 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984). To help subside this abuse, the Supreme Court has sculpted from the doctrines of judicial economy and federalism three "finality" principles.

The first two principles arise when a second or successive federal habeas petition is filed. These doctrines derive from Rule 9(b) of the Rules Governing § 2254 Cases.[1] The first of these tenets concerns successive claims; that is, the same or substantially similar demands for relief. *Sanders v. United States*, 373 U.S. 1, 9–10, 83 S.Ct. 1068, 1073–1074, 10 L.Ed.2d 148 (1963). The second principle, often labelled "abuse of the writ," handles claims in a successive petition where the petitioner has deliberately withheld a viable claim that could and should have been raised in the previous petition. *Sanders*, 373 U.S. at 10, 83 S.Ct. at 1074.

---

1. Rule 9(b) provides:

 A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

Both doctrines bar a court's consideration of these claims. "Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless, piecemeal litigation, to entertain collateral proceedings whose only purpose is to vex, harass or delay." *Sanders*, 373 U.S. at 18, 83 S.Ct. at 1078–79; *Thigpen v. Smith*, 792 F.2d 1507, 1513 (11th Cir.1986).

Nevertheless, a federal district court should not invoke these principles if "the ends of justice would not be served by reaching the merits of subsequent application." *Sanders*, 373 U.S. at 15, 83 S.Ct. at 1077; *see also Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). Recently, the Supreme Court gave substance to the ends of justice test. The Court believed the ends of justice are satisfied only when the petitioner makes "a colorable showing of factual innocence." *Kuhlmann*, 106 S.Ct. at 2627.[2]

■ Procedurally, when the state alleges abuse through a sucessive petition (as Florida has here), the burden is on the petitioner to show that no abuse transpired. *In re Shriner*, 735 F.2d 1236, 1240 (11th Cir. 1984). In this Circuit, to satisfy this burden the petitioner must show (1) that the previous petition was not based on the merits; (2) that if the previous claim was based on the merits, the ends of justice would be served by reconsideration; (3) that there was an intervening change in the facts or law; or (4) that failure to present the ground in the prior habeas proceeding "was neither the result of an intentional abandonment or withholding nor the product of inexcusable neglect." *Witt v. Wainwright*, 755 F.2d 1396, 1397 (11th Cir.1985) (citing *Sanders*, 373 U.S. 1, 83 S.Ct. 1068); *Stephens v. Kemp*, 721 F.2d 1300 (11th Cir.1983); *Potts v. Zant*, 638 F.2d 727 (5th Cir. Unit B 1981); *Paprskar v. Estelle*, 612 F.2d 1003, 1005–06 (5th Cir.1980).

The third finality principal derives from notions of comity. A "procedural bar" limits a federal court's ability to entertain a habeas claim when the petitioner failed to follow a state's procedural requirements in raising the claim on appeal or in a collateral attack. To overcome this bar, a petitioner must prove both "cause and actual prejudice." *Reed v. Ross*, 468 U.S. 1, 11, 104 S.Ct. 2901, 2908, 82 L.Ed.2d 1 (1984); *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572–73, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

This court now examines these jurisdictional limits in light of each claim of the successive petition. In so doing, the court will explore these doctrines more fully, and reach the merits of a claim when necessary.

### A. The Hitchcock Claim—Nonstatutory Mitigating Factors

■ The state argues that this petition is procedurally barred, even though the Supreme Court of Florida recognized that *Hitchcock* represents "a substantial change in the law." *Martin v. Dugger*, 515 So.2d 185, 187 (Fla.1987); *Thompson v. Dugger*, 515 So.2d 173 (Fla.1987); *Demps v. Dugger*, 514 So.2d 1092, 1093 (Fla.1987); *Downs v. Dugger*, 514 So.2d 1069 (Fla. 1987); *Delap v. Dugger*, 513 So.2d 659 (Fla.1987). The Eleventh Circuit, likewise, has recognized *Hitchcock* as breathing new life into *Lockett* claims. Thus, previously unheard or rejected *Lockett* challenges which have not been considered in light of *Hitchcock* require an examination on the merits. *Hargrave v. Dugger*, 832 F.2d 1528, 1533 (11th Cir.1987). The Eleventh Circuit in *Hargrave* pointed to the Florida Supreme Court's reexamination of that court's previously rejected *Lockett* claim in *Thompson*. *Hargrave*, 832 F.2d at 1528 (citing *Thompson*, 515 So.2d at 173 which granted relief on the previously rejected *Lockett* claim in *Thompson v. State*, 410 So.2d 500 (Fla.1982), and the Eleventh Circuit's previous rejection of the same *Lockett* claim in *Thompson v. Wainwright*, 787 F.2d 1447 (11th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987)).

**2.** For an application of *Kuhlmann v. Wilson*, 106 S.Ct. 2616, in the capital sentencing context, see *Moore v. Kemp*, 824 F.2d 847, 856 (11th Cir.1987), *cert. granted sub. nom., Zant v. Moore*, —— U.S. ——, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988).

Prior to *Hitchcock*, the Eleventh Circuit rejected all *Lockett* challenges where the trial judge read the Florida capital statute verbatim, seemingly approved by the Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 251 n. 8, 96 S.Ct. 2960, 2965 n. 8, 49 L.Ed.2d 913 (1976) and subsequently in *Lockett*, 438 U.S. at 606 & n. 15, 98 S.Ct. 2965–2966 n. 15. This rationale of denying *Lockett* claims based on the Eleventh Circuit's interpretation of *Proffitt* and *Lockett* was first articulated in *Ford v. Stickland*, 696 F.2d 804, 811–13 (11th Cir.1983) and followed consistently after *Ford.. See Hitchcock v. Wainwright*, 770 F.2d 1514 (11th Cir.1985) *rev'd* — U.S. —, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Funchess v. Wainwright*, 772 F.2d 683, 691 (11th Cir.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986); *Alvord v. Wainwright*, 725 F.2d 1282, 1299 (11th Cir.) *cert. denied*, 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984); *Booker v. Wainwright*, 703 F.2d 1251, 1259–60 (11th Cir.1983). *See also Straight v. Wainwright*, 772 F.2d 674, 678–79 (11th Cir. 1985), *cert. denied*, 475 U.S. 1099, 106 S.Ct. 1502–03, 89 L.Ed.2d 903 (1986); *Raulerson v. Wainwright*, 732 F.2d 803, 807 n. 3 (11th Cir.1984); *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir.) *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *Dobbert v. Strickland*, 718 F.2d 1518, 1523–24 (11th Cir.) *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *Shriner v. Wainwright*, 715 F.2d 1452, 1457 (11th Cir.1983). *See infra* Part III(A). Further, as petitioner rightly points out, in those other cases where the *Lockett* claim was raised, this Circuit rejected the claims on procedural default grounds, based on the rationale in *Ford. See, e.g., Straight supra; Proffitt v. Wainwright*, 756 F.2d 1500, 1504–05 (11th Cir.1984); *Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983), *cert. denied*, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984); *Antone v. Strickland*, 706 F.2d 1534, 1536–38 (11th Cir.), *cert. denied*, 464 U.S. 1003, 104 S.Ct. 511, 78 L.Ed.2d 699 (1983); *Goode v. Wainwright*, 704 F.2d 593, 601–02 (11th Cir.), *rev'd on other grounds*, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983). In light of this substantial change in the law this court finds, in its discretion, that petitioner

has not abused the writ with respect to the *Hitchcock* claim.

### B. *The Ford Claim Cannot Be Barred*

■ The *Ford* claim cannot be barred from adjudication. The Supreme Court in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), created a new constitutional right. Prior to *Ford*, a prisoner did not have an eighth amendment right not to be executed while insane. Because *Ford* was a substantial change in constitutional law, Martin was unaware of the legal significance of relevant facts. Accordingly, to bar Martin's second claim would be unreasonable. *See Haley v. Estelle*, 632 F.2d 1273, 1275 (5th Cir.1980).

### C. *The Sandstrom Issue—Burden of Proving Sanity Under Florida Law*

■ In *Martin v. Wainwright*, 497 So.2d 872 (Fla.1986), the Florida Supreme Court noted that Martin's claim should have been raised on appeal and that "[h]abeas is not a substitute for appeal." *Id.* at 874 n. 2. Martin admits in this, his second habeas petition to this court, that he cannot meet the "cause" prong of *Wainwright v. Sykes*, 433 U.S. at 85–91, 97 S.Ct. at 2505–2509. Martin argues, however, that this court must reach the merits of Martin's claim because the burden of proving sanity was unconstitutionally shifted to him during the course of the trial. *See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d. 368 (1970). *Accord Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

The Court has always been willing to entertain the possibility of granting habeas relief even where procedural defaults have occurred to protect constitutional rights. In *Moore v. Dempsey*, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923), Mr. Justice Holmes writing for the majority reversed and remanded a denial of the Great Writ where the district judge dismissed a petition of five black men who were charged and convicted in state court for the murder of a white man.

The petition alleged a plethora of constitutional violations. The murder occurred after a group of allegedly racist whites killed a number of black people assembled in a church and where, in the ensuing foray, a white man was killed apparently by one of the white group. The governor appointed a committee of seven white men to investigate what the committee called the "insurrection." *Id.* at 88, 43 S.Ct. at 265–66. The committee members propogated inflammatory statements to the effect that the Negroes were deliberately planning the insurrection against the whites. The local newspapers published similar inflammatory accounts. The petitioners alleged that the committee had certain black witnesses whipped and tortured until they testified against the petitioners. The grand jury contained a committee member and all blacks were excluded from both the grand and petit juries. The trial lasted approximately forty-five minutes and the jury delivered their verdict of first degree murder against all petitioners. Petitioners were sentenced to death. The Arkansas Supreme Court denied petitioners' motions for a new trial as untimely and upheld the convictions. *Id.* at 88–92, 43 S.Ct. at 265–267. The Court held that the district judge had the duty to examine "the facts for himself when if true as alleged they make the trial absolutely void." *Id.* at 92, 43 S.Ct. at 267.

The Court in *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), found that a district court had the power to hear the merits of petitioner's claim that his confession had been physically coerced, even though a procedural forfeiture may have occurred under state law. *Id.* at 426, 83 S.Ct. at 842. Justice Brennan, writing for the Court, was emphatic on the power of the Great Writ: "Our survey discloses nothing to suggest that the Federal District Court lacked the *power* to order Noia discharged because of a procedural forfeiture he may have incurred under state law." *Id.* at 426, 83 S.Ct. at 842.

The *Fay* Court formulated a discretionary test which would allow the federal district court to "deny relief to an applicant who has deliberately bypassed the orderly procedure of the state courts." *Id.* at 438,

83 S.Ct. at 848–49. The Court would apply the waiver test of *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), "an intentional relinquishment or abandonment of a known right or privilege." *Id.* 372 U.S. at 439, 83 S.Ct. at 849.

The *Fay* standard was eroded in a series of decisions where the Court, although recognizing that the federal district court had the raw power to hear a procedurally deficient habeas petition on the merits, began to decline to hear procedurally deficient claims. In *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), the Court concluded that a petitioner who had failed to challenge the composition of the grand jury pursuant to Fed.R. Crim.P. 12(b)(2) was procedurally barred from raising the issue on collateral attack, pursuant to 28 U.S.C. § 2255. *Id.* at 242–43, 93 S.Ct. at 1582–83. *Accord Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963).

The Court extended the reasoning of *Davis* to procedural defaults which occurred in state proceedings. *See Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). The Court analogized the rationale of *Davis* to the state-federal comity concerns enunicated in *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669, 676 (1971). Justice Stewart, writing for the majority, saw no reason why the state prisoner should have any greater right to collaterally attack a state court judgment than the federal prisoner in *Davis.* *Francis,* 425 U.S. at 541–42, 96 S.Ct. at 1711 (quoting *Kaufman v. United States,* 394 U.S. 217, 228, 89 S.Ct. 1068, 1075, 22 L.Ed.2d 227, 228 (1969)).

Finally, in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Court officially adopted the cause and prejudice test to all habeas petitions, rejecting "the sweeping language of *Fay v. Noia.*" *Id.* at 87, 97 S.Ct. at 2506–07. Justice O'Connor in *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), reiterated the comity theme articulated in *Sykes* and spoke of the danger of

allowing those habeas claims which would diminish the "sanctity" of the trial process: "Liberal allowance of the writ, moreover, degrades the prominence of the trial itself." *Id.* at 127, 102 S.Ct. at 1571. *But see Sykes,* 433 U.S. at 99, 97 S.Ct. at 2512–13 (Brennan, J., dissenting); *Francis,* 425 U.S. at 542, 96 S.Ct. at 1711–12 (Brennan, J., dissenting).

Although the Supreme Court has more stringently applied the cause and prejudice test of *Sykes* in recent years, *see Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2653–60, 91 L.Ed.2d 397 (1986) (Stevens, J., concurring), the Court has consistently recognized that the cause and effect test is not absolute: "[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray,* 106 S.Ct. at 2650. *See also Reed v. Ross,* 468 U.S. 1, 10, 104 S.Ct. 2901, 2907, 82 L.Ed.2d 1 (1984); *Daniels v. Allen,* 344 U.S. 443, 73 S.Ct. 437, 97 L.Ed. 469 (1953).

Writing for the majority, Justice O'Connor, in *Murray v. Carrier,* 106 S.Ct. at 2639, reaffirmed the Court's commitment to the cause and prejudice test and reiterated that both prongs must be met in order for a petitioner to overcome procedural defaults. *Id.* at 2648. *See also Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 2667–68, 91 L.Ed.2d 434 (1986), *Dorman v. Wainwright,* 798 F.2d 1358, 1370 & n. 22 (11th Cir.1986). In this petition, Martin concedes that he cannot meet the cause test of *Sykes* and its progeny. This court's inquiry, however, cannot end here.

Having conclusively determined that petitioner has not shown cause for his procedural default with respect to this claim, this court now turns its attention to inquire whether this is one of those "extraordinary case[s], where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 106 S.Ct. at 2650. *See also Matter of Spencer,* 228 U.S. 652, 660–61, 33 S.Ct. 709, 711, 57 L.Ed. 1010 (1913). This court must conclude that this is not one of those cases.

Martin asserts that the trial judge's instructions to the jury forced Martin to bear the burden of proof of sanity in violation of his fourteenth amendment right under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). He argues that the jury instruction impermissibly directed the jury to presume that Martin was sane thereby shifting the burden of proof to him. In the event that the evidence raised a reasonable doubt as to Martin's sanity, the state was then required to prove beyond a reasonable doubt that Martin was legally sane at the time of the commission of the alleged offense. The instruction in question read as follows:

> Insanity may be permanent, temporary or may come and go. It is for you to determine the question of the sanity of the defendant at the time of the alleged commission of the crime. Until the contrary is shown by the evidence, the defendant is presumed to be sane, however, if the evidence tends to raise a reasonable doubt as to his sanity, the presumption of sanity is overcome.
>
> . . . . . .
>
> If the evidence presented tends to raise a reasonable doubt as to the sanity of the defendant at the time of the alleged offense, the State must prove beyond a reasonable doubt that the defendant was legally sane at the time of the commission of the alleged offense. It is sufficient as to the defense of insanity if the evidence raises in the minds of the jurors a reasonable doubt as to the sanity of the defendant at the time of the alleged crime and if you have a reasonable doubt as to his sanity at that time, it is your duty to find him not guilty by reason of insanity.

[R. 4146–47]. Martin insists that this instruction ran counter to Florida law in that Florida law places the burden upon the petitioner to prove that there exists a reasonable doubt regarding the defendant's sanity at the time he committed the alleged offense. Petitioner's argument that the burden was unconstitutionally shifted to him would be cognizable if it were true that Florida law allowed no presumption of

sanity. This construction of Florida's sanity law, however, is only one-half of the equation.

The other half of the equation is that sanity is presumed, "but where there is testimony of insanity sufficient to present a reasonable doubt of sanity *in the minds of the jurors*, the presumption vanishes and the sanity of the accused must be proved by the prosecution as any other element of the offense, beyond a reasonable doubt." *Yohn v. Florida*, 476 So.2d 123, 126 (Fla.1985) (quoting *Jones v. State*, 332 So.2d 615 (Fla.1976) (Sunberg, J., specially concurring)); *Accord Holmes v. Florida*, 374 So.2d 944 (Fla.1979), *Ex rel. Boyd v. Green*, 355 So.2d 789 (Fla.1978). Florida law allows for the presumption of sanity until the evidence presented tends to raise a reasonable doubt; once that reasonable doubt is raised, the state has the burden of proving beyond a reasonable doubt that the defendant was in fact sane.

A state has the option of defining sanity and the corresponding burdens as it chooses. In *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Court approved New York state's practice of placing the burden of sanity *entirely* upon the defendant. Further, New York law requires the defendant to prove that he was insane by a preponderance of the evidence. In *Patterson*, the court found the New York statute to comport with the requirements of the court's decision in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which required a state to prove "beyond a reasonable doubt [ ] every fact necessary to constitute the crime with which he is charged." *Id.* at 364, 90 S.Ct. at 1072–73. Clearly, Florida law on this issue places a much greater burden upon the state than does New York law.

The court concludes, therefore, that the burden of proving insanity was not unconstitutionally shifted to the defendant. If any burden was placed upon the defendant, it was merely an affirmative burden to raise the issue. If there was even a reasonable doubt raised in the minds of the jurors, the burden was then placed upon the state to show that the defendant was sane beyond a reasonable doubt. Because

the instruction given clearly expressed the law of Florida, petitioner has failed to show "a constitutional violation [which] has probably resulted in the conviction of one who is actually innocent." *Murray*, 106 S.Ct. at 2650. This claim is, therefore, procedurally barred under the cause and prejudice rule.

### D. *The Strickland Claim is an Abuse of the Writ*

■ Martin now raises for the first time an ineffective assistance of counsel claim. Because all of the underlying facts supporting this claim were known by Martin when he filed his first petition, and, because the ends of justice would not be served by adjudicating this claim, the claim is an abuse of the writ, and should be denied.

Martin's fourth claim is one for ineffective assistance of appellate counsel. He argues that his appellate counsel failed to raise his absence from part of the voir dire on direct appeal to the Florida Supreme Court. The record reflects that the trial court conducted the voir dire in two stages. In the first stage, Martin's counsel conducted individualized voir dire of each prospective juror. R. 1212–2080. This method allowed Martin to inquire into each potential juror's familiarity with the pretrial publicity concerning the case, and to probe the juror's ability to judge the issues in his case fairly in light of that publicity. Martin was absent during this three-day first stage, apparently on the advice of counsel. R. 1213. The second state was more traditional, for twelve prospective jurors were examined together, and individual jurors were excused either for cause or peremptorially. R. 2107–2977. Martin was present during the second stage. Martin's counsel did not raise on appeal his absence from the first stage. Martin, contending that his right to be present during the first stage was fundamental and could not have been waived, now argues that this failure of Martin's appellate counsel was patent ineffective assistance, entitling him to current relief.

Irrespective of these contentions, Martin did not raise this claim in his first federal

petition. A prisoner who fails to include all his grounds for relief in a first habeas petition risks dismissal of claims raised for the first time in later petitions. *Booker v. Wainwright*, 764 F.2d 1371, 1376 (11th Cir. 1985). This rule is founded upon the equitable nature of the habeas writ. *Kuhlmann v. Wilson*, 477 U.S. 436, 444, n. 6, 106 S.Ct. 2616, 2622, n. 6, 91 L.Ed.2d 364, 375 n. 6; *see also, Sanders v. United States*, 373 U.S. 1, 17, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963). As with all equitable matters, "a suitor's conduct in relation to the proceeding at hand may disentitle him to the relief he seeks." *Sanders*, 373 U.S. at 17, 83 S.Ct. at 1078. Accordingly, when a capital petitioner deliberately withholds one of two grounds for relief in hope of raising the claim in a later proceeding, that prisoner may be deemed to have waived his right to bring the claim. *Id.* at 18, 83 S.Ct. at 1078–79.

A state satisfied its burden of alleging an abuse of the writ by recounting the petitioner's writ history, identifying the claims not raised before the instant petition, and showing that the prisoner should have raised these claims previously. *Booker*, 764 F.2d at 1376. If the state's accusation goes unchallenged, then "the belated presentation of a new ground will be deemed the result of deliberate withholding of a claim, and in violation of 28 U.S.C. § 2254, Rule 9(b)." *Id.*

A petitioner may avoid dismissal for an abuse by establishing one of two theories. A condemned prisoner may first avoid dismissal if he proves "by a preponderance of the evidence that he was ignorant of facts necessary to support the new ground when he filed his prior habeas corpus petition." *Booker*, 764 F.2d at 1367 (citing *Mays v. Balkcom*, 631 F.2d 48, 51 (5th Cir.1980)). Alternatively, a petitioner may delimit the abuse to avoid dismissal by showing that he "did not realize 'that those facts would constitute a basis for which federal habeas corpus relief could be granted.' " *Booker*, 764 F.2d at 1367 (citing *Haley v. Estelle*, 632 F.2d at 1275).

Even if the petition fails to establish either of these theories, a court could hear the claim if to do so "serves the ends of justice." *See Sanders v. United States,*

373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *Kuhlmann,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). In *Kuhlmann,* the Supreme Court defined the parameters of the ends of justice test. The Court adopted the standard proposed by Judge Friendly. A successive petition could be entertained only if a petitioner "supplements his constitutional claims with a colorable showing of factual innocence." *Kuhlmann,* 477 U.S. at 453, 106 S.Ct. at 2626–27, 91 L.Ed.2d at 381 (Citing Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142 (1970)). In a footnote, the Court fully adopted Judge Friendly's viewpoints. The Court noted that a prisoner does not make a showing of innocence by pointing to one aspect of the trial, but by viewing the trial as a whole; that is, the defendant must prove that the trier of facts would have entertained a reasonable doubt of his guilt. *Kuhlmann,* 477 U.S. at 453–55 n. 17, 106 S.Ct. at 2627 n. 17, 91 L.Ed.2d at 381–82 n. 17 (citing Friendly, 38 U.Chi.L.Rev. at 160).

Under this analysis, Martin abused the writ by waiting until now to assert ineffective assistance of appellate counsel. Martin has not contended that he was ignorant of the facts giving rise to this claim when he filed his first petition. In addition, Martin does not allege that he did not realize at the time of his first application that these facts could provide a ground for federal habeas relief. Moreover, when considering the fact that Martin was present when the actual juror challenges were made and the vast amount of evidence introduced against Martin, Martin has not made a colorable showing of factual innocence. Accordingly, this fourth claim is an abuse of the writ and should be denied.

■ Moreover, even if this claim was not an abuse, this court would dismiss the claim on the merits. As the record indicates at p. 1213, Martin decided, after discussing the matter with counsel, that he would waive his right to be present during the first voir dire. Moreover, the record shows that Martin's counsel believed this was a sound trial strategy, informing the

trial judge that he so advised his client in order to avoid unnecessary facial identification. R. 1213. Martin's appellate counsel most likely decided, as this court does, that Martin waived this right, and, as a matter of appellate strategy, decided to concentrate his efforts on his other argument. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) this performance would be far from "deficient," for the appellate counsel did not make an "error so serious that [he] was [no longer] functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 677, 104 S.Ct. at 2059. Accordingly, this effort was not ineffective under *Strickland.*

## III. FAILURE TO CONSIDER OR WEIGH NONSTATUTORY MITIGATING FACTORS—THE HITCHCOCK ISSUE

■ The court must reject Martin's contention that both the jury and the trial judge unconstitutionally failed to consider nonstatutory mitigating factors when recommending and sentencing him to death. Applying the *Lockett–Hitchcock* law and reasoning to the particular circumstances of this case mandates this conclusion.

### A. *Legal Background*

*Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), further articulates the Supreme Court's pronouncements in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which held unconstitutional an Ohio capital punishment statute that did not allow the consideration of nonstatutory mitigating factors. In that case, Sandra Lockett was convicted of aggravated murder and aggravated robbery based on her role as the get-away driver in a robbery where a pawnbroker was murdered. She was sentenced to death even though she was not the triggerwoman. The triggerman, Al Parker, pleading guilty to murder in exchange for not receiving the death penalty, testified against Lockett at trial.

The Ohio statute in question in *Lockett* mandated the trial judge, on a conviction of aggravated murder, to impose the death penalty unless the judge found, by a preponderance of the evidence, that one of three statutorily enunciated mitigating circumstances was present.[3] *Lockett,* 438 U.S. at 593–94, 98 S.Ct. at 2958–59. The three statutory mitigating circumstances were:

1. The victim had induced or facilitated the events;

2. It was unlikely that Lockett would have committed the offense but for the fact that she 'was under duress, coercion, or strong provocation;' or

3. The offense was 'primarily the product of [Lockett's] psychosis or mental deficiency.'

*Lockett,* 438 U.S. at 593–94, 98 S.Ct. at 2958–59 (quoting Ohio Rev. Code §§ 2929.-03–2929.01(B) (1975)). The Ohio trial judge, after considering the statutory mitigating circumstances concluded that he

---

**3.** The pertinent language of the Ohio Statute directing the trial court to impose the death sentence reads as follows:

(E) Upon consideration of the reports, testimony, other evidence, statement of the offender, and arguments of counsel submitted to the court pursuant to division (D) of this section, if the court finds, or if the panel of three judges unanimously finds that none of the mitigating circumstances listed in division (B) of section 2929.04 of the Revised Code is established by a preponderance of the evidence, it shall impose sentence of death on the offender. Otherwise, it shall impose sentence of life imprisonment on the offender.

Ohio Rev.Code Ann. § 2929.03(E) (1975). The pertinent language regarding mitigating circumstances reads as follows:

(B) Regardless of whether one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment and proved beyond a reasonable doubt, the death penalty for aggravated murder is precluded when, considering the nature and circumstances of the offense and the history, character, and condition of the offender, one or more of the following is established by a preponderence [preponderance] of the evidence:

(1) The victim of the offense induced or facilitated it.

(2) It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.

(3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity.

was required to sentence Sandra Lockett to death.

The Court found the Ohio statute violated the eighth and fourteenth amendments because the sentencing judge was not permitted to take nonstatutory mitigating factors into account, such as "her character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime when sentencing the defendant." *Lockett*, 438 U.S. at 597, 98 S.Ct. at 2960–61. The Court relying on its earlier decision of *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976), held that the trial sentencer could not be "precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964–65. Succinctly, *Lockett* requires a trial judge imposing the death sentence to take into account "individualized consideration[s] of mitigating factors." *Lockett*, 848 U.S. at 606, 98 S.Ct. at 2965.

The *Lockett* Court, while requiring nonstatutory mitigating factors to be considered, did not articulate which nonstatutory mitigating factors must be taken into account in capital cases. In Florida death penalty cases the question of which nonstatutory mitigating factors to take into account became clouded because of the Supreme Court's earlier ostensible approval of the Florida death penalty statute in *Proffitt v. Florida*, 428 U.S. 242, 250 n. 8, 96 S.Ct. 2960, 2965 n. 8, 49 L.Ed.2d 913 (1976). The *Lockett* Court also implied in dicta that Florida's death penalty statute was constitutional because it did not expressly preclude the consideration of statutory mitigating factors. *Lockett*, 438 U.S. at 606 & n. 15, 98 S.Ct. at 2965–66 & n. 15, (citing *Proffitt*).

In light of *Proffitt* and *Lockett*, the Eleventh Circuit began applying a gloss on habeas petitions involving *Lockett* appeals. Whenever a trial court judge instructed the jury by reading the mitigating circumstances set forth in the Florida death penalty statute [4] at the sentencing phase of the trial, the Court of Appeals reasoned that constitutional muster had been reached.

---

**4.** The pertinent language of Fla.Stat. § 921.141(6) (1977) is as follows:

(6) Mitigating Circumstances. Mitigating circumstances shall be the following:

(a) The defendant has no significant history of prior criminal activity.

(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's conduct or consented to the act.

(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

(e) The defendant acted under extreme duress or under the substantial domination of another person.

(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(g) The age of the defendant at the time of the crime.

In contrast to the Statute's enunciation on mitigating circumstances, the statute expressly mandates the trier of fact and the Court to limit their consideration of aggravating circumstances:

(5) Aggravating Circumstances. Aggravating circumstances shall be limited to the following:

(a) The capital felony was committed by a person under sentence of imprisonment.

(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

(c) The defendant knowingly created a great risk of death to many persons.

(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or affecting an escape from custody.

(f) The capital felony was committed for pecuniary gain.

(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(h) The capital felony was especially heinous, atrocious, or cruel.

*Id.* at § 921.141(5) (1977). *See Proffitt v. Florida*, 428 U.S. 242, 250 n. 8, 96 S.Ct. 2960, 2965 n. 8, 49 L.Ed.2d 913 (1976). The substance of these two subsections was not changed since *Proffitt*. *See* Fla.Stat. § 921.141(5) and (6) (1985).

*Ford v. Strickland,* 696 F.2d 804, 812 (11th Cir.1983) ("The Supreme Court has recognized [that] the Florida statute does not limit a jury's consideration of mitigating circumstances to those listed in the statute." *Id.* at 812.) Unless the trial judge expressly restricted or precluded the jury or herself from considering nonstatutory mitigating factors, the court rejected the *Lockett* challenge. *See, e.g., Funchess v. Wainwright,* 772 F.2d 683, 691 (11th Cir. 1985) (trial judge instructed the jury that they "shall consider the following: [whereupon the seven statutory mitigating circumstances were read]" *Id.* at 691); *Alvord v. Wainwright,* 725 F.2d 1282, 1299 (11th Cir.1984) (no error was committed because the trial court did not affirmatively "preclude jury consideration of nonstatutory mitigating factors.") *Id.* at 1299 (quoting and distinguishing *Washington v. Watkins,* 655 F.2d 1346, 1377 (5th Cir. Unit A 1981)). *See generally Hargrave v. Dugger,* 832 F.2d 1528, 1533 (11th Cir.1988) (*en banc*) (citing a long line of authority for the Eleventh Circuit's treatment of *Lockett* challenges.)

The Supreme Court's decision in *Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), substantially altered the Eleventh Circuit's and Florida Supreme Court's prior interpretation of the Florida death penalty statute. *Hargrave v. Dugger,* 832 F.2d 1528 (11th Cir.1988) (*en banc*). *See also Armstrong v. Dugger,* 833 F.2d 1430, 1434 (11th Cir.1987). Justice Scalia writing for an undivided Court held that the trial judge's instruction limiting the jury's consideration to statutory mitigating circumstances clearly violated *Lockett* and its progeny. *Hitchcock,* 107 S.Ct. at 1824. *Hitchcock* unearthed much of this circuit's jurisprudence that *Lockett* claims previous to *Hitchcock* were grounded upon. District courts facing *Lockett* challenges must now look closely at the jury instructions, in the context of the entire trial, to determine whether to issue the writ on that claim.

In *Hargrave,* a case decided shortly after *Hitchcock,* the Eleventh Circuit recognized that the Supreme Court had "breathed new vitality into claims based on the exclusion of nonstatutory mitigating factors." 832

F.2d at 1533. The petitioner in *Hargrave* challenged his death sentence based on the failure of the sentencing judge and advisory jury to consider nonstatutory mitigating factors at the sentencing phase.

Sitting *en banc,* the Eleventh Circuit reviewed the judge's instructions to the jury and found that the instruction was substantially similar to the instruction disapproved of in *Hitchcock. Id.* at 1534. The court went further to find references by the trial judge which indicated that he felt bound by the statutorily enumerated factors. *Id.* at 1534–35.

In both *Hargrave* and *Hitchcock,* the defendants proffered nonstatutory mitigating evidence at the sentencing phase. In both cases, the trial judges read the mitigating circumstances as set forth in Fla. Stat. § 921.141(6). In both those cases, unlike the case at bar, the record reflects that neither the jury nor the trial judge considered the nonstatutory mitigating factors in determining whether to recommend or institute the death sentence. *Hitchcock,* 107 S.Ct. at 1824; *Hargrave,* 832 F.2d at 1534–35. While *Hitchcock* breathed new life into *Lockett* claims, it did not *per se* overrule all death sentences after *Hitchcock* was decided. *Elledge v. Dugger,* 823 F.2d 1439, 1448–49 (11th Cir. 1987); *Demps v. Dugger,* 514 So.2d 1092, 1093 (Fla.1987); *Delap v. Dugger,* 513 So. 2d 659 (Fla.1987); *Card v. Dugger,* 512 So.2d 829 (Fla.1987).

In contrast to *Hitchcock* and *Hargrave,* the totality of the circumstances in this case show that the trial judge instructed the jury that they could take into account any factors which they found mitigating— statutory or not. [R. 4491]. The record also reflects that the trial judge took nonstatutory mitigating factors into account when following the jury's recommendation of death and sentencing Nollie Lee Martin to death. [R. 4662]. The case at bar demonstrates that petitioner's trial counsel, gleaning from the language in *Proffitt v. Florida,* was successful in convincing the trial judge that nonstatutory mitigating factors were constitutionally required to be considered in the sentencing phase. Thus,

viewing the jury instruction in context of the entire trial, this court concludes that no *Lockett–Hitchcock* error was committed.

### B. *Adequacy of the Jury Instructions Concerning Nonstatutory Mitigating Factors in the Context of the Guilt/Innocent Trial*

■ When considering the effect of the trial judge's instructions on the jury, this court must view the trial court's instructions in the context of the entire trial. *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Peek v. Kemp,* 784 F.2d 1479, 1486 (11th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). The Fifth Circuit in *Spivey v. Zant,* 661 F.2d 464 (5th Cir.1981), *cert. denied,* 458 U.S. 111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), reversed a death sentence where the trial judge failed to adequately explain to the jury the function and purpose of considering mitigating factors. *Id.* at 471–72. The Fifth Circuit in *Spivey* formulated a "clear instruction" rule, i.e., a trial judge "must clearly and explicitly instruct the jury about mitigating circumstances and the option to recommend against death; in order to do so, the judge will normally tell the jury what a mitigating circumstance is and what its function is in the jury's sentencing deliberations." *Id.* at 471 (footnotes omitted). *See also Westbrook v. Zant,* 704 F.2d 1487, 1503 (11th Cir.1983); *Chenault v. Stynchcombe,* 581 F.2d 444, 447–48 (5th Cir.1978).

The Eleventh Circuit sitting *en banc* in *Peek* reconsidered the panel's decision in *Spivey* and *Westbrook v. Zant,* 704 F.2d 1487, 1503 (11th Cir.1983) and rejected the "clear instruction" test for the "contextual —totality of the circumstances—" test, in light of *Cupp,* 414 U.S. at 147, 94 S.Ct. at 400 and *Francis v. Franklin,* 471 U.S. 307, 322–25 n. 8, 105 S.Ct. 1965, 1975–76 n. 8, 85 L.Ed.2d 344 (1985). The *Peek* Court concluded that when viewing the instruction in context of the entire trial, "[t]he ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner." *Peek,* 784 F.2d at 1489 (citing *Francis supra*). *See also High v. Kemp,* 819 F.2d 988, 990 (11th Cir.1987); *Moore v. Kemp,* 809 F.2d 702 (11th Cir.1987).

The thrust of petitioner's argument is that seen from the perspective of the entire trial, a reasonable juror could believe that he or she need not have considered the proffered nonstatutory mitigating circumstances. Petitioner contends that the jurors were "conditioned" from the beginning to the end of the trial to believe that they were bound to consider the enumerated statutory factors only. Finally, petitioner argues that the trial judge's instructions to the jury, stating that they could take into account *any* nonstatutory mitigating factors they found to be mitigating, could in no measure cure or compensate for all of the previous constitutional infirmities. Consequently, petitioner asserts, a reasonable "juror understood the instruction[ ] in an unconstitutional manner," without "other language in the charge [which would] *explain[ ]* the infirm language sufficiently to eliminate this possibility." *Francis,* 105 S.Ct. at 1975–76 n. 8.

The bulk of the alleged infirmities leading to the alleged juror conditioning lies at the voir dire stage. [R. 2224–26, 2266–67, 2433–34, 2537–39, 2679, 2720–21, 2800, 2823]. During voir dire, petitioner's trial counsel informed the potential jurors that should the case go to the sentencing phase, the jurors would have to consider the aggravating and mitigating factors set forth in the statute and instructed by the judge. [R. 2224–26]; Petitioner's brief for habeas corpus at 83–87. In his petition, Martin lists the various intermittent references to both counsels' remarks concerning what the jury could consider. Included in those instances are several references to the statutory list of mitigating factors. [R. 224–26, 2433–34]. While defense counsel mentioned to the potential jurors that there were certain mitigating factors, he never specified what those factors were. Defense counsel, in the same breath, informed the potential jurors that the judge would instruct them on what those mitigating factors were. The other instances petitioner designates as error, [R. 2244–45, 2249, 2262, 2266–67, 2433–34, 2537–39, 2679, 2720–21, 2800, 2823], were instances where

defense counsel spoke of "certain mitigating factors." All of these instances were questions to the potential juror asking the juror if he or she would follow the judge's instructions on mitigating circumstances.

Several jurors expressed relief that there were guidelines on what to consider for mitigating factors. [R. 2537–39]. Petitioner argues that the potential juror's relief demonstrates that the jurors were misinformed of the law, resulting in the alleged constitutional error. This court disagrees. Mr. Presscott, who eventually sat on the jury, stated: "I'm relieved to learn in this courtroom there is [sic] mitigating circumstances and there is a set standard. I would not want that responsibility solely upon myself without some kind of guidance." [R. 2538]. The defense counsel's followup question was "Are you glad it [the death sentence] is not mandatory? MR. PRESSCOTT: Yes." [R. 2538]. The record does not reflect that the jurors believed themselves bound to the statutory enumerated factors which had neither been explained nor mentioned to them. The thrust of the references petitioner cites is that the jurors would follow the judge's instructions at the sentencing phase if the need were to arise. Ultimately, the judge told them that they should consider whatever else they found to be a mitigating circumstance, statutory or otherwise. [R. 4491].

Looking at the totality of the circumstances and the context in which the key instruction was given, the court concludes that at this early stage no reasonable juror would have believed that they were bound by trial counsel's remarks. No specific factors were mentioned and the gist of the above references show that the jurors were committed to following the judge's instructions. When a potential juror asked the prosecuting attorney the meaning of the terms aggravating and mitigating, she replied:

MISS VITUNAC: That's a good point. Nobody does at this stage because we haven't told you what they are and you don't get them unless we reach stage two in the trial and His Honor will read you a list as to what the legislature decides are aggravating circumstances

and those that they have decided to be mitigating circumstances and it will function to listen to the evidence and the testimony and weigh one against the other to determine whether or not your recommendation should be death or life imprisonment. Will you agree to follow those, whatever they are?
MR. JORDAN: Yes.
MISS VITUNAC: At this point in the trial we are not permitted to go in and explain to you the law. It is not our function and it is solely the province of the court and that comes at the end of this all so we have to deal in generalities at this point.

[R. 2720–21]. The court finds that the prosecutor's remarks merely informed the potential jurors of the basic framework of the trial; counsel was not instructing them on the actual state of the law. The thrust of petitioner's conditioning argument is, therefore, too tenuous and far-reaching to establish juror confusion or misapplication of constitutional law.

The jurors in this action were the same jurors who decided the first phase of the trial. The judge had instructed them on the applicable law with respect to the guilt/innocent phase of the trial. At the second phase of the trial, after this jury found the defendant guilty as charged, the jurors heard testimony from witnesses and other evidence constituting nonstatutory mitigating factors and were instructed on the law as it applied to that phase of the trial.

Petitioner now asks this court to speculate on what the jurors may have thought because of defense counsel's vague references to the statutory mitigating factors made during voir dire. The court agrees with the state that defense counsel's statements were explanatory in nature, informing the jury that they could not blindly institute the death penalty, but would instead be bound to follow the law as the judge instructed. At voir dire, obviously, the jurors were not being instructed as to the law, or how to apply it. Moreover, the court does not believe that a reasonable juror would take statements made by de-

fense counsel at the earliest stage of these proceedings, as the law that she should apply at the second phase of these proceedings. Thus, this court refuses to go behind the clear instructions of the trial judge to delve into the quagmire of speculative, tenuous possibilities that the jurors were conditioned to follow something other than the law as instructed by the trial judge. Petitioner's argument simply does not raise "any legitimate basis for finding ambiguity concerning the factors actually considered by the trial court." *Eddings v. Oklahoma*, 455 U.S. 104, 120, 102 S.Ct. 869, 879–80, 71 L.Ed.2d 1 (1982) (O'Conner, J., concurring).

### C. *Nonstatutory Mitigating Factors Were Considered at Martin's Sentencing Trial*

A review of the entire sentencing phase convinces this court that the dictates of *Lockett–Hitchcock* were met. At the sentencing phase, the trial judge instructed the jury on the specifics of what they were to consider and defense counsel presented his case to the jury concerning what he perceived to be the strongest nonstatutory mitigating circumstances. Petitioner's counsel began arguing nonstatutory mitigating factors to the jury in his opening argument at the sentencing phase:

> In addition to that, ladies and gentlemen, you will hear evidence as to other mitigating factors which are not listed. You will be entitled to review a letter which was sent by a member of Mr. Martin's family.
>
> There will be a report by a psychologist who did not testify at trial but came to certain conclusions which you will see support the mitigating factors.
>
> You will hear evidence from a Dr. George Barnard who was a professor at the University of Florida and he is a psychiatrist and you will hear that he reached a diagnosis which in all respects supports three mitigating factors that I mentioned to you.
>
> Additionally, you will hear the testimony of a Professor Hans Zeisel who is a professor of law and sociology from the University of Chicago and has been studying the death penalty for over twenty years and you will hear from him

as to what his findings are in regard to the deterent value and the effect of the death penalty.

> I believe that after you have considered the aggravating and mitigating factors present, that the evidence will show you that the mitigating factors far outweigh the aggravating factors and I do thank you and I will get to address you again after the close of all the evidence.

[R. 4270–4271]. Petitioner's counsel intended for the jury and the judge to consider nonstatutory mitigating factors at the sentencing trial; and the judge and the jury did consider these outside factors.

After opening argument, the state presented its two witnesses and rested. The jury was excused and the bench and bar discussed, *inter alia*, the letter to the jurors from Nollie Lee Martin's brother, Harry Martin. The trial judge decided, over the state's objections, to allow the letter to be read aloud in open court as well as to allow the letter to be admitted into evidence, for the juror's consideration during deliberation. [R. 4285–86].

When the jury returned, psychiatrist Dr. George Barnard was called as a supporting expert witness for the defense. Dr. Barnard testified that in his expert opinion, Nollie Lee Martin suffered from schizophrenia. Dr. Barnard opined that Nollie Lee Martin committed the capital felony under extreme emotional duress, and that Martin's capacity to appreciate the criminality of his conduct was substantially impaired.

While Dr. Barnard's testimony went to statutory mitigating factors, the next defense witness' testimony went to factors outside the list of statutory mitigating circumstances. Fla.Stat. 921.141(6). Professor Hans Zeisel, professor emeritus of law and psychology at the University of Chicago Law School, addressed the general deterrent effect of the death penalty. The thrust of Professor Zeisel's testimony was that the death penalty had no real deterrent effect in thwarting capital crimes. Professor Zeisel testified that the "state of the art" research indicates that there is no

deterrent effect to capital punishment. [R. 4365].

The next witness called to the stand was Dr. Rufus M. Vaughn, who had previously testified for the defense at the first phase of the trial. Dr. Vaughn corroborated the testimony of Dr. Barnard in that he believed Nollie Lee Martin was acting under the influence of extreme mental or emotional distress. Dr. Vaughn testified that he had spent approximately twenty-two hours with the defendant [R. 4376], and like Dr. Barnard, it was his expert opinion that Nollie Lee Martin could not appreciate the criminality of his conduct [R. 4377]. His testimony went to statutory mitigating factors.

The next nonstatutory mitigating factor offered into evidence was the letter of Harry Martin, brother of Nollie Lee Martin. The letter directly addressed the jury and was read aloud by the clerk of the court. Harry Martin pleaded to the jury to have mercy on his brother:

Ladies and gentlemen of the jury, I am writing you a pleading [sic] and asking you to have mercy on my brother Nollie Lee Martin.

Please, don't take his life. As long as he was or lived around mother, dad, sister and myself, we could talk to him and help him. He has to have someone to talk to him about things he is doing.

You see, ladies and gentlemen of the jury, he has always seemed to be confused about what he should or shouldn't do. I am very sorry that all this has happened. Our father and mother are Christians. They believe in God, our Lord and his son, Jesus.

My brother grew up in a Christian home. Mother and dad have not drank [sic] any alcoholic drinks or took the Lord's name in vain during my brother's life. They tried to teach him the right way. They took him to Sunday school and preaching when he was a boy and taught him the right way to live.

Dad has always pleaded with him to live for the Lord and mother has begged him with tears flowing, 'Please, son don't get into trouble. You [sic] dad and I can't live through it.'

Ladies and gentlemen of the jury, this is about to kill them. For their health is very, very bad. That is why they were not at the trial. Back in 1956 mother had a very, very bad heart attack. The doctor didn't think she would come out of it alive. He said that a year or two would be her limit as to life but all, dad, myself and other Christian friends prayed and she is still living today.

We have seen many miracles through the years so we know our God can help us. Ladies and gentlemen of the jury, please have mercy for I am begging you to please have mercy on Nollie. For there is [sic] really four lives to consider. I am sure mom and dad will die from grief and shock. They live on daily heavy medication.

Dad has high blood pressure, an enlarged heart and is a sugar diabetic and a lot of other things too. Mother has an enlarged heart 100 percent, cancer of the stomach and low blood [sic] and she needs to take at least two operations but her heart is too weak to be put to sleep.

I am sure that my sister couldn't stand it either. She has very serious nervous condition that when badly upset causes her breath to cut off [sic]. So please for the good Lord's sake, please don't [take] Nollie's life. I am begging, please.

For how can I stand to see them all dead. You see, we all love Nollie very much. He is the youngest one of us and the only brother I have left alive. I have two more that are dead.

. . . . .

Ladies and gentlemen of the jury, I am telling you about another terrible thing that happened years ago. I was only twelve years old. My sister was ten years old. Nollie was eight years old and my oldest brother not Nollie, was in Florida and our family went for a walk on Easter Sunday, April 2nd, and we returned home. A crazy drunk man just shot right at all of us. My brother Nollie was killed [the oldest brother Nollie]. Dad was injured, and the DA told dad we have a good case against him, the man who killed my brother. He'll get first

degree without mercy killing a child like that.

But the man's family, I mean his mother and father were good people, so my father was sorry for them and had mercy on them. He, my dad asked the DA if they could spare the man's life. The DA said not in first degree [sic] but they could try him in second degree.

He the man who killed my brother would get up to 30 years so dad said, well, let it go in second degree [sic]. My son is gone, to kill him wouldn't bring my son back to me and the man was crazy drunk to do such a thing.

So maybe that bothered Nollie, the one in Florida, to think about having the name of a dead brother who was murdered. So also, we also had an uncle named Nollie who died when he was three years. So ladies and gentlemen of the jury, I believe you are nice people. I am praying for each one of you that God who has power and is able to help each one of you through each trial and trouble that awaits you in this life will also give you a home with him when this life is over and I am sure that good people like you will make the right decision for each one of us will stand before God, his righteousness judge [sic] and be sentenced in one of the greatest courts of all time. We will all be present that day.

I am pleading again please good people, have mercy on Nollie and the rest of us. His life is in your hands. I am begging for mercy. I hope to meet each of you in heaven each day. My only hope is in God, our Lord, and you good people.

Ladies and gentlemen of the jury, please, remember us when you have prayers. I have told a little of the things God has done for us and at least two terrible things, a dead brother's terrible fate and a live [sic] sick one who is in your hands. Please help Nollie. He needs help. I would be happy if you could help him. He, Nollie, has a serious mental problem. Yours truly, Harry Martin.

[R. 4387–95.] Harry Martin's letter demonstrates that the jury was presented with many nonstatutory mitigating factors which they were instructed to consider. The letter presents evidence of Nollie Lee Martin's unique family history and family relationships, and of tragic circumstances in his life that might account for his criminal behavior. The jury was informed that recommending death might result in extreme hardship for Martin's innocent family members. This plea to the jury would certainly place a reasonable juror in the position of knowing relevant nonstatutory mitigating factors which they might find persuasive in deciding against recommending the death penalty.

### D. *The Jury was instructed to consider and the trial judge considered mitigating factors*

*Hitchcock* reiterated the Court's pronouncements in *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed. 2d 1 and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), in the context of Fla.Stat. § 921.141. Neither the advisory jury nor the sentencing judge can be precluded from or refuse to consider the defendant's proffered nonstatutory mitigating factors. *Hitchcock*, 107 S.Ct. at 1824. The record reflects, however, that the jury was instructed to consider the proferred nonstatutory mitigating factors and the judge did consider the proffered outside factors.

After the letter of Harry Martin was read to the jury, the jury was recessed and the bench and the bar, *inter alia*, discussed the applicable jury instructions. At issue was the proper jury instruction for the aggravating and mitigating circumstances. Defense counsel argued that the Supreme Court's then recent decision in *Proffitt v. Florida*, 428 U.S. 242, 251 & n. 8, 96 S.Ct. 2960, 2965–66 & n. 8, 49 L.Ed.2d 913 (1976), required the court to allow a proffer of nonstatutory mitigating factors for the jury's consideration. [R. 4406]. Defense counsel vigorously asserted that the jury must be entitled to consider Professor Zeisel's testimony concerning the deterrent effect of the death penalty, as a nonstatutory mitigating factor.

The trial judge actively participated in this discussion as to what was the proper jury instruction on mitigating factors. The

court confronted the problem of dealing with mitigating circumstances in "the spirit of liberality," [R. 4408], but not involving the jury with considerations of the constitutionality of the capital statute. Defense counsel suggested a compromise jury instruction: "Eliminating anything but the constitutionality because that is not the question, just to instruct them that the death penalty is in existence in Florida and that you will be instructed as to how it should be applied." The trial judge clearly understood the thrust of defense counsel's argument for he stated: "Now, whether or not other matters may be mitigating is a matter for the jury to decide and the defense is not restricted. In other words, he may argue other things are mitigating and the jury decides whether or not they are. Isn't that the sense of it?" [R. 4413]. Both attorneys agreed. The final charge to the jury as the result of this exchange between the lawyers and the judge was

> The aggravating circumstances which you may consider are limited to those upon which I will instruct you. However, there is no such limitation upon the mitigating factors which you may consider. However, the jury is the fact finder which determines whether or not a factor is mitigating if it is not one enumerated by the statute.

[R. 4491]. Although not a part of the standard jury instructions, the judge clearly understood that nonstatutory mitigating factors were for the judge and the jury to consider in their deliberations.

Defense counsel's closing argument to the jury further reiterated to the jury its duty to consider nonstatutory mitigating circumstances. [R. 4479]. Defense counsel argued that the jury could consider the broader implications of the death penalty, taking into account the testimony of Professor Zeisel. He asked the jury to consider that Nollie Lee Martin is a human being no matter how sick, that he is someone's son, someone's brother, and the ramifications that the death penalty would have on Nollie Lee Martin's family. [R. 4479]. He reminded the jury that the death penalty will not bring back the victim, Patricia Greenfield. The jury was asked to consider, if they felt it was a mitigating circum-

stance, the comparative culpability between the codefendant, who pleaded guilty to second-degree murder and received a sentence of 99 years. In all, defense counsel reminded the jury of the testimony they had previously heard concerning the proffered nonstatutory mitigating circumstances and he reminded them, in no uncertain terms, of their duty, as instructed by the judge, to consider any mitigating circumstance which they found to be mitigating—statutory or nonstatutory. [R. 4479–83]. Viewing the judge's instruction in the context of the entire trial, this court concludes that no reasonable juror could not have known that she was instructed to consider the "character and record of the individual offender and the circumstances of the particular offense," *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed. 2d 944 (1976), in recommending a sentence of death.

The trial judge, like the jury, applied the "individualized consideration[s] of mitigating factors ... requiring by the Eight and Fourteenth Amendments in capital cases." *Lockett,* 438 U.S. at 606, 98 S.Ct. at 2965. The Eleventh Circuit has held that even assuming that the jury instructions were erroneous under *Hitchcock:* "When the trial judge has the proper view of the law ... and imposes sentence based not only on statutory, but also on nonstatutory, factors, the resulting sentence meets the constitutional parameters outlined in *Lockett." Elledge v. Dugger,* 823 F.2d 1439, 1449 (11th Cir.1987).

Clearly, the trial judge understood the constitutional necessity of considering all nonstatutory mitigating factors. First, the trial judge was persuaded by defense counsel's argument concerning the constitutionally required consideration of proffered nonstatutory mitigating factors. He allowed the proffer of testimony from Professor Zeisel and the letter of Harry Martin. Moreover, the discussion with counsel concerning the proper jury instruction for the nonmitigating statutory circumstances indicates that the trial judge perfectly understood and appreciated defense counsel's argument concerning *Proffitt,* which came to be crystallized in the Supreme Court's decision of *Lockett* and its progeny. *Ed-*

*dings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Second, in the trial judge's sentencing order, he stated: "Like the jury, however, I must choose. I determine from the *totality* of the evidence that it does not establish any mitigating factor." [R. 4662] (emphasis added). The court concludes, therefore, the record overwhelmingly demonstrates that no *Lockett–Hitchcock* error occurred.

## IV. AN EVIDENTIARY HEARING IS REQUIRED ON THE ISSUE OF MARTIN'S INCOMPETENCY

The court now turns to the issues raised by Martin's alleged incompetency to be executed. Florida, following the procedures it adopted in response to *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), found Martin competent to be executed. Martin contends that Florida, in making this finding, violated two of his constitutional rights. Martin first argues that Florida's standard of competence does not afford the full protection guaranteed by the eighth amendment. Martin then argues that the Florida procedures utilized to determine his competency

to be executed violated his due process rights.[5] After reviewing the procedures utilized by Florida in making its decision, examining these procedures in light of the court's limited habeas jurisdiction and finding that these procedures violate Martin's rights under the United States Constitution, the court concludes that an evidentiary hearing is necessary to resolve the issue of Martin's competency to be executed.

### A. Florida's Procedures to Determine Martin's Competency to be Executed

Because Martin's case is the first to test the procedure Florida developed in response to *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), this court will review in detail the various stages of these proceedings. The court will begin with the pre-*Ford* requirements and then trace Martin's attempts to have Florida conform with the mandates in *Ford*.

In *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Supreme Court struck down the procedures outlined in Fla.Stat.Ann. § 922.07 (West 1985).[6] This section instructed the Florida governor, upon request by the prisoner, to

---

5. Martin claims that Fla.Stat. § 922.07 and Fla. R.Crim.P. 3.811 are unconstitutional as applied in his case. Martin does not make a facial challenge to the constitutionality of the statute or rule. A facial challenge is "of course, the most difficult challenge to mount successfully." *United States v. Salerno*, —— U.S. ——, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). In a facial challenge the fact that the statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, for the Supreme Court has not recognized an overbreath doctrine outside the limited context of the First Amendment. *Schall v. Martin*, 467 U.S. 253, 268 n. 18, 104 S.Ct. 2403, 2412 n. 18, 81 L.Ed.2d 207 (1984).

6. Fla.Stat. § 922.07, as amended, provides

(1) When the Governor is informed that a person under sentence of death may be insane, he shall stay execution of the sentence and appoint a commission of three psychiatrists to examine the convicted person. The Governor shall notify the psychiatrists in writing that they are to examine the convicted person to determine whether he understands the nature and effect of the death penalty and why it is to be imposed upon him. The examination of the convicted person shall take place with all three

psychiatrists present at the same time. Counsel for the convicted person and the state attorney may be present at the examination. If the convicted person does not have counsel, the court that imposed the sentence shall appoint counsel to represent him.

(2) After receiving the report of the commission, if the Governor decides that the convicted person has the mental capacity to understand the nature of the death penalty and the reasons why it was imposed upon him, he shall issue a warrant to the warden directing him to execute the sentence at a time designated in the warrant.

(3) If the Governor decides that the convicted person does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him, he shall have him committed to a Department of Corrections mental health treatment facility.

(4) When a person under sentence of death has been committed to a Department of Corrections mental health treatment facility, he shall be kept there until the facility administrator determines that he has been restored to sanity. The facility administrator shall notify the Governor of his determination, and the Governor shall appoint another commission to proceed as provided in subsection (1).

appoint a panel of three psychologists to evaluate the prisoner's mental state. *Id.* Under this section, the governor had to determine whether the prisoner had the "mental capacity to understand the nature of the death penalty and the reasons why it was imposed upon him." *Id.* The governor's decision was final and no review in a court of law was available. Seven justices of the Supreme Court found this procedure to violate the due process clause of the fourteenth amendment.

Martin's first opportunity to challenge the Florida procedures for determining competency to be executed began in November 1986. After his first federal habeas petition was denied by this court (a

decision which the Eleventh Circuit affirmed, *see Martin v. Wainwright,* 770 F.2d 918 (11th Cir.1985), and which the Supreme Court refused to review, *see Martin v. Wainwright,* — U.S. ——, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986)), the governor of Florida scheduled Martin's execution for November 12, 1986. Prior to this date, Martin filed a petition for writ of habeas corpus in the Florida Supreme Court. Martin alleged in this petition that he was incompetent to be executed and that Florida had no procedure compatible with *Ford.*

On November 13, 1986, the Florida Supreme Court issued Florida Rules of Criminal Procedures 3.811 as an emergency rule.[7] *See In re Emergency Amendment*

---

(5) The Governor shall allow reasonable fees to psychiatrists appointed under the provisions of this section which shall be paid by the state.

**7.** Florida Rule of Criminal Procedure 3.811 provides

(a) Procedure for raising. When proceedings under section 922.07, Florida Statutes (1985), are initiated, and such proceedings result in a determination by the governor that the convicted person under death sentence has the mental capacity to understand the nature of the death penalty and why it is to be imposed upon that person, a judicial proceeding is authorized to review that determination. Such a proceeding shall be instituted by a written motion by counsel for the prisoner asserting grounds why a belief persists that the prisoner is not mentally competent to be executed. Such a motion shall be filed within three days of the governor's determination of competency in the circuit where the prisoner is located. A hearing on the motion shall be set as soon as possible by one of the judges of that circuit or by another judge assigned by the chief justice of the Supreme Court to hear the motion.

The trial judge shall review the experts reports and any written submissions from the parties, including experts representing the prisoner. No evidentiary hearing shall be required, but the trial judge, at his or her discretion, may allow the parties to present oral argument and may permit or require the live testimony of witnesses, including one or more of the experts. If the court finds that the prisoner understands the nature and effect of the death penalty and why it is to be imposed upon the prisoner, it shall enter its order so finding.

(b) Disposition on finding of incompetency.

(1) If the court determines that the prisoner is not mentally competent to be executed, the court shall stay the execution and order the prisoner committed to a Department of Corrections mental health treatment facility. The order of commitment shall contain the following:

(a) Findings of fact relating to the issues of competency to be executed and involuntary hospitalization.

(b) Copies of the experts' reports filed with the court pursuant to the order of examination; and

(c) Any other written submissions relative to the prisoner's competency to be executed received by the court.

(2) The treatment facility shall admit the prisoner for hospitalization and shall retain and treat the prisoner. No more than six months from the date of admission the administrator of the treatment facility shall file with the court a report addressing the prisoner's competency to be executed, with copies to all parties. If at any time during the six-month period, or during any extended period of hospitalization which may be ordered pursuant to this rule, the administrator of the facility shall determine that the prisoner has become competent to be executed, the administrator shall so notify the court by a report, with copies to all parties.

(3) Within thirty days of receiving any report from the treatment facility's administrator, the court shall consider that report and any written submissions from the parties and may allow the presentation of oral argument. If the court determines that the prisoner continues to be incompetent to be executed, the court shall order continued hospitalization and treatment for a period not to exceed one year. The procedure set out in paragraph (3) and this procedure shall be repeated prior to the expiration of each one-year period of hospitalization.

(4) If at any time after hospitalization under this rule the court decides that the prisoner is competent to be executed, the court shall enter its order so finding and shall vacate its stay of execution.

(c) Effect of adjudication of incompetency to be executed; psychotropic medication.

(1) An adjudication of incompetency to be executed shall not operate as an adjudication of

to Florida Rules of Criminal Procedure, Rule 3.811, Competency to be Executed, 497 So.2d 643 (Fla.1986). The emergency rule was to remain in effect until a permanent rule, which the court claimed was being developed by the Florida Bar, could be enacted. *See Martin v. Wainwright,* 497 So.2d 872, 873 (Fla.1986) (footnote omitted). The Supreme Court then instructed Martin's counsel to initiate the sanity proceedings set out in Fla.Stat. § 922.07 and if necessary to follow the review procedure provided in Fla.R.Crim.P. 3.811.

Florida Rule of Criminal Procedure 3.811 provides that a judicial proceeding is authorized to review the determination by the governor that a convicted person under a death sentence is competent to be executed. The prisoner must file this petition for review no later than three days after the governor's determination. The rule did not specify what the standard of review was and left to the trial judge's discretion whether to hold an evidentiary hearing.

After promulgation of Rule 3.811, Martin's counsel advised the governor that Martin was incompetent to be executed. The governor did not immediately reschedule Martin's execution and took no further action to resolve the competency issue.

After the Supreme Court of the United States denied Martin's petition for certiorari seeking a review of the Florida Supreme Court's promulgation of Rule 3.811, Governor Martinez signed Executive Order No. 87–118 on August 3, 1987. This order appointed a commission of three psychologists pursuant to Fla. Stat. § 922.07. The doctor's task was to examine the competency of Martin. The examination was scheduled for September 29, 1987.

On September 24, 1987, Martin filed a petition for writ of *quo warranto* or for extraordinary relief in the nature of *quo warranto* in the Supreme Court of Florida.

Martin sought a stay of the § 922.07 proceedings claiming that any use of § 922.07 was unconstitutional under *Ford.* In a summary order entered September 28, 1987, the Florida Supreme Court refused without opinion to stay Martin's § 922.07 examination.

After this order was entered, Martin's counsel served notice upon the governor that he would not permit Martin to participate in the § 922.07 examination. He informed the governor that he believed Florida's procedure for determining competency to be executed still required deference to the governor's finding, and that was in violation of *Ford.*

Nonetheless, the § 922.07 commission convened at Florida State Prison on September 29, 1987, as scheduled. Martin's counsel objected to the commission's effort to evaluate Martin on the basis of *Ford,* and the commission terminated its efforts. Because of Martin's lack of cooperation, on October 15, 1987, Governor Martinez signed another death warrant for Martin, scheduling his execution for the week beginning at noon, November 4, 1987, and terminating at noon on November 11, 1987.

On October 20, 1987, Martin filed a motion for determinance of competence to be executed pursuant to Fla.R.Crim.P. 3.811. Judge Osee Fagan of the Circuit Court of the Eighth Judicial Circuit, Bradford County, Florida, dismissed the petition on October 26, 1987. Judge Fagan found that he lacked jurisdiction under Rule 3.811, for the governor never made a competency determination as required by Fla.Stat. § 922.07.

Martin appealed this finding to the Florida Supreme Court. On October 28, 1987, the Florida Supreme Court upheld the constitutionality of the mixed § 922.07/Rule 3.811 procedure. The court first examined the mechanics under Rule 3.811. The court

---

incompetency to consent to medical treatment or for any other purpose unless such other adjudication is specifically set forth in the order.

(2) A prisoner who, because of psychotropic medication, has sufficient ability to understand the nature and effect of the death penalty and why it is to be imposed upon him or her shall

not be deemed incompetent to be executed simply because his or her satisfactory mental condition is dependent upon such medication.

(3) Psychotropic medication is any drug or compound affecting the mind, behavior, intellectual functions, perception, moods or emotion and includes anti-psychotic, anti-depressant, anti-manic, and anti-anxiety drugs.

rejected Martin's contention that the trial court would give undue deference to the governor's determination that a prisoner was competent to be executed. The court found that because the rule directs the trial court to review the expert's reports and written submissions from the parties, the rule allows the trial court to decide competency without extending undue consideration to the governor's determination. *Martin v. Dugger*, 515 So.2d 185 (Fla.1987).

The Florida Supreme Court also refused to find that Martin waived his claim of incompetency to be executed. The court noted that it was Martin's counsel's decision (not Martin's) to refuse to have Martin participate in the § 922.07 proceeding. Accordingly, the Florida Supreme Court entered a stay of Martin's execution until Martin's competency procedures were concluded. *See Martin v. Dugger*, 515 So.2d 185 (Fla.1987).

On November 1, 1987, a new commission of psychiatrists evaluated Martin pursuant to the provisions of § 922.07. On that same day, the commission provided a five-sentence written report to the governor. This report concluded that Martin was competent to be executed under the criteria of § 922.07.

On November 2, 1987, Governor Martinez issued Executive Order No. 87-176. This order accepted the commission's report and Governor Martinez determined that Martin was competent to be executed.

On November 5, 1987, Martin filed a motion for determinance of competence to be executed pursuant to Fla.R.Crim.P. 3.811. In this motion, Martin requested an evidentiary hearing. On the previous day, Judge Fagan, who was to hear the motion, informed the Attorney General of the State of Florida that a hearing on this yet-to-be-filed motion would be held on November 6, 1987. Judge Fagan asked the Attorney General to inform Martin's counsel that a hearing would be held on November 6th. Fagan also instructed the Attorney General to inform Martin's counsel that the judge had not yet decided on whether an evidentiary hearing would be allowed. The attorney general followed their directions and informed Martin's counsel accordingly.

The hearing before Judge Fagan took place as scheduled. Because the details of this hearing are essential to the resolution of this petition, the court reviews the proceedings before Judge Fagan in detail.

Judge Fagan began the hearing by noting that he ordered this hearing believing that Martin would file his motion. Fagan transcript at p. 4. He noted that "considerable material" accompanied the motion's filing. Judge Fagan stated that he reviewed all the matters that were submitted to him.

Judge Fagan then noted that the procedures of Fla.Stat. § 922.07 had been followed. Pursuant to the Supreme Court's order in *Martin v. Dugger*, 515 So.2d 185 (Fla.1987), Judge Fagan noted that he would give "no probative value" to the governor's finding. He noted that he considered it a "procedural prerequisite only." Fagan transcript at p. 56.

Judge Fagan, however, then qualified the statement. He stated he did give "great consideration to the detailed report of the stenographer who recorded the psychiatrists' interview with Martin in the prison. Fagan transcript at p. 6.

Judge Fagan then considered the difficult problem of the appropriate standard of review.

JUDGE FAGAN: I have tried to familiarize myself as best I can with my perception of what is required under *Ford*. I know that our Supreme Court said just the other day that the procedure to be followed is that that is prescribed or suggested by Mr. Justice Powell though his was not a majority opinion. But, nonetheless, the comment made by him about the test involved is consistent with Florida law and the Supreme Court said in this very case that's the test to be applied here.

Fagan Transcript at p. 6.

Judge Fagan then noted that time was of the essence. Fagan Transcript at p. 6. He thanked counsel for submitting materials in the shortened period to assist him "for whatever it is that we are to do here today." Fagan Transcript at p. 6–7.

The hearing continued and Judge Fagan for the first time decided the particular evidentiary nature of this proceeding.

JUDGE FAGAN: The rule prescribes that the court is not required to hold an evidentiary hearing. But I am nonetheless going to permit counsel to present such evidence and argument at this time as they care to, to cross-examine witnesses that are present, and I will not delay this hearing or postpone it. I intend to stay with this matter until we conclude it.

Fagan Transcript at p. 7.

This led to a debate between Martin's counsel and the court.

MARTIN'S COUNSEL: ... under the rule the presumption is there will be no evidence taken. The court has the discretion to permit the evidence to be taken, but the rule says the court is not required to take evidence.

. . . . .

MARTIN'S COUNSEL: ... I have no interest (in cross-examining Dr. Mhatre, the state psychologist who examined Martin pursuant to the governor's order). I'll cross-examine him if the state cares to put him on. But I'm not waiving the right to present witnesses. I simply did not have any notice that I needed to have witnesses here today, neither notice directly from the court nor from the rule. In fact, the notice provided by the rule is to the contrary; that an initial appearance is presumptively not an evidentiary hearing. So I certainly reserve my client's rights and I stand by the request to be made for an evidentiary hearing. But I am not prepared to present any witnesses on Mr. Martin's behalf. I did come prepared to make an argument and I will be happy to make that.

JUDGE FAGAN: Does the state wish to present evidence?

FLORIDA ATTORNEY GENERAL: Your Honor, we are prepared today. Your notice was that there was to be a hearing and we assumed that because of the warrant being active, that we should be prepared for all eventualities and we have an argument to be made but we also have Dr. Mhatre here and we could call him.

JUDGE FAGAN: I will hear whatever y'all want to present.

. . . . .

FLORIDA ATTORNEY GENERAL: I am prepared to argue that the issue of competency can be resolved on the material before you. And under the rule, that's sufficient for you to make a decision.

JUDGE FAGAN: Well, it may be. But I have indicated already that I'm offering an opportunity for the defense, if it cares to, to present evidence in this case. And it was at my suggestion, and I reaffirm it and restate it to you, that I will offer you an opportunity, if you wish to, examine Dr. Mhatre, who is here. If you care to challenge what he did or why he did it, or anything you want to ask him about this case, I'll permit you to do so.

MARTIN'S COUNSEL: Your Honor, at this point Dr. Mhatre has no opinion other than a conclusory opinion that's been expressed. Now, and I've already explained to your Honor in my papers—of how that is of absolutely no value.

JUDGE FAGAN: That's what you said.

MARTIN'S COUNSEL: Well, if the state wishes to put him on to have him explain what he did, then I would certainly want to cross-examine him. But I have no interest in calling him as a witness.

JUDGE FAGAN: Well, I want to let it be clear that I am—have already and am now and will continue to consider until I dispose of this matter the reports that were submitted to me that are required by the statute and the rules which includes the transcript that you furnished me, and I thank you for it. Not only the conclusions reached by the three experts, but the interview itself. And if that conclusion is to be challenged by you, I offer you again the opportunity to do it.

MARTIN'S COUNSEL: But, Your Honor, two responses. One, I think the papers make out a sufficient challenge.

JUDGE FAGAN: All right, sir.

MARTIN'S COUNSEL: Secondly, with respect to the lack of notice that I needed

to have witnesses here today, I simply want the record—

JUDGE FAGAN: Sir, now wait a minute. Let's correct the record now. I didn't say you needed to or didn't need to. That's a decision for you to make.

MARTIN'S COUNSEL: Your Honor, in any court of law that I've ever been a part of, the parties are given notice as to the nature of the proceeding. Now, your Honor, I believe you agreed—did not say this would be an evidentiary hearing. Concededly, you did not say it would not be an evidentiary hearing; you simply said nothing.

JUDGE FAGAN: There was nothing pending before me. And I had no request presented to me, and tried to comply with the law. It says I shall set a hearing. And I assumed that you would, within the three-day period that's prescribed by law, file something.

MARTIN'S COUNSEL: Yes, sir.

JUDGE FAGAN: And I set this hearing for that purpose.

. . . . .

JUDGE FAGAN: In your pleadings you asked for an evidentiary hearing. I assume that was done with the knowledge that I was to have a hearing today and that you wanted to present evidence.

MARTIN'S COUNSEL: Your Honor, it was done with the knowledge that the court had set 11:00 a.m. for an appearance by counsel. I inquired with the attorney general who called me as to whether he knew witnesses would have to be available or not. He said he did not know.

JUDGE FAGAN: Indeed he didn't, because I didn't know either. I had not received anything.

MARTIN'S COUNSEL: My reading of the rule—and if I'm wrong, then I'm ineffective in representing Mr. Martin. My reading of the rule is that presumptively there will be no evidentiary hearing. This court is not even required to have an appearance. All the court is required to do is to receive papers and consider them. That's what the rule says. Our being here today is utterly discretionary with you. If I had even 24 hours' notice, I would have tried to get whatever witnesses here I could. Certainly after the papers were filed yesterday. It's been about 24 hours since they were filed. In light of my request, if the court had given me notice, I would have tried to get witnesses here.

I have five expert witnesses, one of whom lives in Florida, the others of whom live in other states. I have four inmates I would like to have here, but certainly I can't get them here on my own. I have to have at least the cooperation of the state or subpoena power to get them.

I have had absolutely no notice until about 15 or 20 minutes ago that this was going to be an opportunity to present evidence. So my position is that without adequate notice, this is not a meaningful opportunity to present evidence. And I stand—at this point I simply would stand on my submissions. I do have argument to make about those submissions.

JUDGE FAGAN: I want to hear you. I'm offering one final time: Anybody that wants to present any evidence in this hearing, I'll be glad to consider it. If there's none to be considered, I'll hear arguments

. . . . .

JUDGE FAGAN: I want to exhaust everything that you all feel like you ought to tell me today.

Fagan Transcript at p. 7–16.

After this exchange, Martin's counsel began with his argument. His argument was premised upon the state's alleged violation of Martin's eighth amendment rights. In the course of Martin's counsel's argument, Martin's counsel described the qualifications of the psychiatrists he used to determine Martin's incompetency to be executed. The qualifications of one of these doctors, Dr. Halleck, were reviewed. Judge Fagan commented upon his qualifications:

JUDGE FAGAN: He's got record paper qualifications galore, as far as I'm concerned. But I'm also concerned that his position is very, very critical of the procedure that's mandated by the law of this state.

Now, he's critical of what they did and the way they did it and why they did it. But the doctors in this case did what they did because that's the only way you can do it in this state and do it the way we prescribe.

Fagan Transcript at p. 28.

The state began its argument by noting that the issue of Martin's competency probably could be resolved on the basis of the material that both parties submitted.

FLORIDA ATTORNEY GENERAL: We submit, your Honor, that the facts show that the Florida Supreme Court, on October 28th of this year, directed that Martin not be executed until the competency provisions under this rule are completed. The rule directs this court to review the submissions of the parties and then, in the court's discretion, you may have a further evidentiary hearing. We submit the parties' submittances are sufficient and the record of examination of November 1st supports the doctors' conclusions which were given to the governor that Martin is competent because he understands the nature of the death penalty and why it's to be imposed.

Fagan transcript at p. 36.

The state continued its argument by contending that the issue of Martin's competency was fully resolved by the jury in 1978 when it found Martin sane at the time the offense was committed.

After Martin's counsel replied to the state's argument, Judge Fagan, *sua sponte,* called Dr. Mhatre, the state psychologist, to take the witness stand. Judge Fagan described his actions:

JUDGE FAGAN: The court is in somewhat of a quandary, because I wish to be as fair as I can and learn as much as I can before coming to a conclusion about a very, very significant matter such as this. I don't wish to style Dr. Mhatre as a court witness, although I don't have any problem with that. And neither the state nor the defense offered evidence. But it just seemed to me to be, since we're all here assembled, and since I have announced and I continue to be willing to receive evidence at this hearing, and since Dr. Mhatre is here, it

seemed to me to be utterly foolish, with the gravity of the situation here, for me not to at least have Dr. Mhatre offer such explanation as to his own conclusions and permit counsel for the state and the defense to examine him in any appropriate way regarding these matters.

While it may be possible for the court to reach a conclusion and, as each counsel has said for both the state and the defendant, I'm not required to do this, it just seems to me to be, in trying to be fair and because of the availability of the witness, I'm going to permit him now to be questioned.

Fagan transcript at p. 47. After these remarks the state began direct examination of Dr. Mhatre, and Mr. Burr was provided an opportunity to cross-examine.

Judge Fagan then reached his conclusions.

JUDGE FAGAN: I wish that circumstances were such that would permit us in a more leisurely fashion to consider and determine the very important question that I have to decide. I also wish that the reasons and the conclusions that I have reached could be better stated, and I believe could be better stated had I had the opportunity to, with more leisure, develop and express my thoughts. That, too, is not permitted.

I am sure that what I am about to say is going to be rather loose-jointed; it's certainly not organized. I have not had the opportunity to organize it, and I make these comments only to state for the record so that my thoughts will be preserved for review by other appropriate authorities.

I remind everyone that as Mr. Justice Potter said—excuse me, that Mr. Justice Powell said, that the protections of the eighth amendment which we are here considering today, and with which I am sure we all agree, do not address the question of whether the execution in this case is to take place, but when.

While it may be difficult to accept and perhaps, in the defendant's case, he is unwilling to accept that he is to be exe-

cuted, that is, as far as the law is concerned, that issue was resolved even in spite of the disputes regarding his mental state, contrary to his assertions, by the Florida Supreme Court when it originally affirmed the conviction, review of which was denied by the United States Supreme Court, and again when the Florida Supreme Court affirmed the denial by Judge Mounts of the 3.850 motion.

. . . . .

But notwithstanding the prior precedent in this case that has been set, and notwithstanding my admiration for the trial judge and his determinations, it is my responsibility to now consider, notwithstanding those determinations, this whole issue in this case. And this is: Does the defendant understand the nature and effect of the death penalty and why it is to be imposed upon him.

I was prepared, as a result of my duty, unless persuaded otherwise, to conclude that the defendant does understand the nature and effect of the death penalty and why it is to be imposed upon him when I entered this courtroom this morning. But I wanted, of course, to hear whatever would be presented to me that might persuade me otherwise, because there is no further review once the defendant is executed.

It's because of my understanding of the gravity of the decision that I have to make that I spent the time that I did in reviewing everything that has been given me in this case. And some of it on several other occasions. I am not sure that it's necessary for me to attempt to articulate what I believe Florida would do if asked to expressly state itself regarding the *Dusky* problem of so-called rational or factual understanding. I am sure that the defendant would equate rational explanation and rational understanding, and they are not the same. I don't find anything, as far as this record is concerned, that suggests to me that additional inquiry is necessary or appropriate.

The interviews taken—that took place with the defendant at the prison by the three appointed doctors without conclusions reached or expressed by the doc-

tors caused me to conclude—though I'm not an expert, I have been exposed to matters similar to this for a long, long time. A study and review of those interviews, even that one with Dr. Lewis, would cause me in my own lay opinion to conclude that the defendant indeed understands the nature and effect of the death penalty and why it is to be imposed upon on him.

I will state for the record that I discount considerably the conclusions reached by Dr. Lewis. I have never before in my life seen one who is supposed to be an objective observer, especially one examining one's mental state, who displayed more of an advocate's role than that displayed by her in that interview. Much of what she did was attempting to buttress conclusions that she had before she ever conducted it, to support decisions that she reached some time ago. And she even was anxious to make sure that the record documented her observations in order that her partisan attitude would be supported when brought up for review.

I see nothing other than a pure objectivity in the interview with the three experts appointed by the governor. The credentials presented here regarding the two that I don't know are quite adequate and the one that I do know who testified here today are persuasive and convincing as far as I'm concerned.

In addition to that, the presentation made today by Dr. Mhatre is even more persuasive, supporting the conclusion expressed by him and the one found by me, that the defendant indeed understands the nature and effect of the death penalty and why it is to be imposed.

My reasons for calling Dr. Mhatre were as I have already expressed before asking him to take the witness stand. But an additional reason: As far as I'm concerned, I wanted to know if there were any loopholes in his conclusions. I wanted to know if there was something about what he concluded and why he concluded it that would raise some doubt in my mind. My own analysis is that

there is no reason that I should have a doubt, and I don't have one.

I shall enter this written order immediately after I have prepared it, entitled "Order Finding Defendant Competent to be Executed: Having studied the conclusions and considered all the material filed with this court, including the experts' reports and all the written submissions from the parties, including experts representing the petitioner and having considered the evidence and arguments presented at this hearing, the court finds that the prisoner understands the nature of the death penalty and why it is to be imposed upon him. It is therefore ordered that the procedures in regard to the prisoner's competency to be executed are now concluded. Done and ordered at Starke, Bradford County, Florida, this 6th day of November 1987."

Fagan transcript at pp. 86–94. The hearing was then adjourned.

On November 10, 1987, the Supreme Court of Florida affirmed Judge Fagan's findings. In so doing, the Supreme Court of Florida rejected Martin's challenges based upon the fourteenth and eighth amendments. The Florida Supreme Court specifically noted that the holding of an evidentiary hearing under Rule 3.811 is discretionary with the trial court. Judge Fagan's sending of notice to the parties two days in advance was adequate notice to the parties. *See Martin v. State,* 515 So.2d 189 (Fla.1987). The court specifically found that Judge Fagan did not have to stop these proceedings so that witnesses could be gathered from distant places to reiterate in person what had already been said on paper. *Id.* at 190.

With respect to the eighth amendment challenge, the court found the factual versus rational understanding based on *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), to be inapplicable. *Martin v. State,* 515 So.2d at 190. The court noted that *Dusky* concerned a defendant's competency to stand trial, which was not the issue presented here. *Id.* The court noted that the nature of Martin's mental condition is basically the same as was presented at trial. *Id.* The Florida Supreme Court concluded that

Judge Fagan properly applied the necessary factors of determining Martin's competency to be executed. The court noted that the fact Martin believes that a satanic conspiracy resulted in his conviction does not override his understanding of why he is being executed. *Id.* The court noted that "these proceedings were directed only to Martin's competency to be executed, a narrower interpretation than what is required for competency to stand trial." *Id.*

Justices Ehrlich and Barkett dissented. *Id.* at 190–194. Justice Ehrlich dissented because he believed that under the circumstances that existed in this case, petitioner should have been permitted to offer the testimony of live witnesses. *Id.* at 191. Justice Barkett found that the hearing conducted was flawed procedurally and substantively. *Id.* at 192. She believed that *Ford* required at a minimum "a fair adversarial proceeding." She noted that Martin did not receive that before Judge Fagan because procedural due process required that notice of the proceedings be given. *Id.* at 192. Justice Barkett then commented that requiring a party to bring every witness it intends to call to a hearing, even though no witnesses may be allowed to testify, "encourages wasteful expenditures that ultimately may be the responsibility of the state." *Id.* at 193. Justice Barkett noted that Judge Fagan's feeling that he could not look beyond the procedures utilized by the state psychiatrist directly contravened the dictates of *Ford*. *Id.* In addition, Justice Barkett noted that the majority's reliance upon competency at trial to be irrelevant to the determination of whether he is now competent to be executed. *Id.*

After this decision was entered, Martin filed his petition for habeas corpus in this court. The court now addresses Martin's claim of incompetence.

B. *Under 28 U.S.C. § 2254(d) and Townsend v. Sain, an Evidentiary Hearing is Required*

■ A federal habeas court faces a perplexing jurisdictional situation. The writ of habeas corpus is designed to "safeguard

the liberty of all persons within the jurisdicition of the United States against [detentions] through any violation of the Constitution." *Townsend v. Sain,* 372 U.S. 293, 311, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963) (citing *Hawk v. Olson,* 326 U.S. 271, 274, 66 S.Ct. 116, 118, 90 L.Ed. 61 (1945)). Accordingly, "a single federal judge may overturn the judgment of the highest court of a state insofar as it deals with the application of the United States Constitution or laws to the facts in question." *Sumner v. Mata,* 449 U.S. 539, 543–544, 101 S.Ct. 764, 767–768, 66 L.Ed.2d 722 (1981). This awesome power, however, often infringes upon the rights of our sister sovereigns. In exercising habeas jurisdiction, a federal court, therefore, must balance its authority with due consideration for the fundamental structure of our federal system.

Both Congress and the Supreme Court have provided guidance for federal habeas courts to resolve this jurisdictional problem. By enacting 28 U.S.C. § 2254(d), Congress formulated a presumption of correctness doctrine that "establishes the varying degress of deference that state factual findings are to be afforded." *Antone v. Strickland,* 706 F.2d 1534, 1547 (11th Cir. 1983) (Kravitch, J. specially concurring.) In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court created a test that determines when a federal habeas court must conduct an evidentiary hearing to resolve the habeas petition. After utilizing both § 2254(d) and *Townsend,* this court concludes that Florida's finding of competency is not entitled to a presumption of correctness and an evidentiary hearing on this issue is required.

1. The presumption of correctness doctrine.

In response to the *Townsend* decision three years earlier, Congress enacted 28 U.S.C. § 2254(d) in 1966. *See* Robbins, *Whither (or Wither) Habeas Corpus?: Observations of the Supreme Court's 1985 Term,* 111 F.R.D. 265, 274 (1986). Section 2254(d) provides:

In any proceeding instituted in a federal court by an application for writ of habeas corpus by a prisoner in custody pursuant to the judgment of a state court, the determination after a hearing on the merits of a factual issue made by a state court of competent jurisdiction in a proceeding to which the applicant for the writ and the state or an officer or an agent thereof are parties evidenced by a written finding, written opinion, and other reliable adequate written indicia shall be *presumed to be correct* unless the applicant shall establish or it shall otherwise appear or the respondent shall admit

(1) that the merits of the factual dispute were not resolved in the state court proceeding; (2) that the fact finding procedure employed by the state court was not adequate to afford a full and fair hearing; (3) that the material facts were not adequately developed at the state court hearing; (4) that the state court lacked jurisdiction of the subject matter or over the person of the applicant in the state court proceedings; (5) that the applicant was an indigent and the state court in deprivation of its constitutional right failed to appoint counsel to represent him in the state court proceeding; (6) that the applicant did not receive a full and fair and adequate hearing in the state court proceeding; (7) that the applicant was otherwise denied due process of law in the state court proceeding; (8) unless that part of the record of the state court proceeding in which the determination of such factual issue is made pertinent to a determination of the sufficiency of the evidence to support such factual determination is produced as provided for hereinafter in the federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

And in an evidentiary hearing or proceeding in the federal court, when due proof of such factual determination has been made unless the existence of one or more of the circumstances respectfully set forth in paragraphs numbered (1) through (7), inclusive, is shown by the

applicant, otherwise appears or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the state court proceeding considered as a whole does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the state court was erroneous.

28 U.S.C. § 2254(d) (emphasis added).

In *Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 770–771, 66 L.Ed.2d 722 (1981), the Supreme Court mandated a federal court to apply § 2254(d) pursuant to the intent of Congress. The court found that Congress had a dual purpose in the enactment of § 2254(d) to be twofold. Congress first desired that § 2254(d) always be applied so as to alleviate some of the friction between state and federal courts that is a necessary consequence of the writ of habeas corpus. *Id.* at 550, 101 S.Ct. at 770–771. In addition, Congress intended to serve the interest that both society and the individual criminal defendant have "in assuring that there will at some point be the certainty that comes with an end to litigation and that attention will ultimately be focused not on whether a conviction was free from error, but rather on whether the prisoner can be restored to a useful place in the community." *Id.* at 550 n. 3, 101 S.Ct. at 770–771 n. 3.

The particular mechanics of § 2254(d) are relatively straightforward. Findings of fact made by the state court system after a proper adversarial hearing, *see Germany v. Estelle*, 639 F.2d 1301, 1305 (5th Cir. 1981), "shall be presumed to be correct" unless one of seven conditions specifically set forth in § 2254(d) is found to exist. *Sumner v. Mata*, 449 U.S. at 550, 101 S.Ct. at 770–771. If the court finds that none of these seven conditions exists and concludes that the relevant state court determination is being "fairly supported by the record, the burden shall rest" upon the habeas petitioner "whose case by that time has run the entire gamut of a state judicial system," *see Sumner v. Mata*, 449 U.S. at 551, 101 S.Ct. at 771, to establish by "convincing evidence that the factual determination

of the state court was erroneous." 28 U.S.C. § 2254(d), *see also Parker v. Parratt*, 662 F.2d 479, 483 (8th Cir.1981) (referring to the evidentiary standard as a clear and convincing measure). While a court may hold an evidentiary hearing to determine whether the presumption applies, *see In re Wainwright*, 678 F.2d 951, 953 (11th Cir. 1982), if the presumption applies, an evidentiary hearing pursuant to a *de novo* review is inappropriate unless the presumption is overcome.

Because the presumption of correctness is capable of being overcome, this doctrine differs substantially from other habeas jurisdictional theories that "conclude" review of state court findings. For example, the doctrine in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), is a complete bar to review. *Stone* holds that "where the state has provided an opportunity for full and fair litigation of a fourth amendment claim, a state prisoner *may not be granted* federal habeas relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. at 494, 96 S.Ct. at 3052 (footnotes omitted) (emphasis added). As the Eighth Circuit noted in *Cody v. Solem*, 755 F.2d 1323, 1328 n. 3 (8th Cir.1985), *Sumner* is not *Stone*. *Sumner*, therefore, does not conclude review. With this understanding, the court now applies § 2254(d) to Martin's case.

Before determining whether any of the conditions spelled out in § 2254(d) are present here, the court must resolve two preliminary issues. The first question is whether the proceeding before Judge Fagan is a "hearing" within the meaning of § 2254(d). The second issue is whether Florida's finding of competency is a finding of fact entitled to the presumption or a mixed question of fact and law, not so entitled. The court now addresses these issues in turn.

■ Nothing in § 2254(d) establishes the type of hearings that are entitled to its presumption of correctness. The section only makes reference to "a determination after a hearing on the merits of a factual issue," provided that this determination be evidenced by "a written finding, written

opinion, or other reliable and adequate written indicia." *Id.*

In *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), the Supreme Court found the state appellate court proceeding to be a "hearing" within the meaning of § 2254(d). In reaching this conclusion, the Court noted that both the respondent and the state were formally before the court, that respondent was given an opportunity to be heard, and that his claim received "plenary consideration." *Id.* at 546, 101 S.Ct. at 768–769. The Court then considered these considerations in light of the congressional intent underlying § 2254(d). It held that the "interest in federalism recognized by Congress in enacting § 2254(d) requires deference by federal courts to factual determinations of *all* state courts." *Id.* at 547, 101 S.Ct. at 769 (emphasis added).

When analyzed in this framework, the proceeding before Judge Fagan was a hearing within the meaning of § 2254(d). The fact that Judge Fagan transcribed his remarks rather than expressed them in writing does not defeat this conclusion. *See Wainwright v. Witt,* 469 U.S. 412, 430, 105 S.Ct. 844, 855, 83 L.Ed.2d 841 (1985). Moreover, both parties were formally before the court and, albeit limited, both parties were afforded an opportunity to be heard. Under *Sumner's* analysis, the Judge Fagan proceeding is a § 2254(d) "hearing." *Cf. Beasley v. Holland,* 649 F.Supp. 561, 563–564 (S.D.W.Va.1986) (finding a state court collateral proceeding to be entitled to the presumption).

The second preliminary consideration—whether a determination of competency to be executed resolves a question of fact, a question of law, or a mixed question —is more difficult. The § 2254(d) restrictions on federal court review of habeas petitions apply only to "issues of fact" as found by the state courts. *See Fendler v. Goldsmith,* 728 F.2d 1181, 1190–1191 n. 21 (9th Cir.1984). Section 2254(d) is inapplicable to federal court review of state court decisions regarding either purely legal questions or mixed questions of law and fact. *See generally Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714–1715, 64 L.Ed.2d 333 (1980), *Brewer v. Williams,* 430 U.S. 387, 403, 97 S.Ct. 1232, 1241–1242, 51 L.Ed.2d 424 (1977).

Although the Supreme Court usually determines whether a specific issue in one of its habeas cases is a question of law or fact, the *Ford* court never specifically characterized the issue of competency to be executed. Five justices intimated that the presumption may apply, but never expressly addressed this issue. Both the Marshall and Powell opinions had no practical reason to reach this question, for both found § 2254(d) inapplicable to nonjudicial proceedings. *Ford,* 106 S.Ct. at 2602–03, 2609. Justice O'Connor did not considered the issue, and neither did Justice Rehnquist in his dissent.

Perhaps the *Ford* court's refusal to handle this fact/law distinction was due in part to the fact that this area of law is continually evolving. *See, e.g., Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985) ("[T]he appropriate methodology for distinguishing questions of fact from questions of law has been ... elusive."). Traditionally, the nature of the state court's finding usually determined whether an issue was one of fact or law. Currently, a court takes an overview of the state court's ruling mechanism and determines whether deference to a particular finding should be afforded. Throughout this evolution, courts have confusingly characterized issues concerning a prisoner's mental state as both questions of fact and mixed questions of law and fact.[8]

---

8. The Supreme Court itself has considered a number of issues in this framework, reaching results that are difficult to harmonize. The Court has found the following to be mixed fact-law questions: Conflict of interest from multiple representation by defense counsel, *see Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); impermissibly suggestive pretrial identification procedures, *see Sumner v. Mata,* 455 U.S. 591, 592,

102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982); ineffective assistance of counsel, *see Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). In contrast, the Court has held the following to be questions of fact only: Voluntariness of a guilty plea, *see Marshall v. Lonberger,* 459 U.S. 422, 431–32, 103 S.Ct. 843, 849–50, 74 L.Ed.2d 646 (1983); competency to stand trial, *see Maggio v. Fulford,* 462

Under the traditional view, a federal court focused upon the state court's finding. A state court concerned itself with "issues of fact" if the state judge made findings of basic preliminary or historical facts. *See Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980). These were findings based on facts: "a recital of external events and the credibility of their narrators." *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6 9 L.Ed.2d 770 (1963). A state court resolved mixed questions of law and fact when the judge applied "legal [or constitutional] principles to historical facts of [the] case." *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Brewer v. Williams,* 430 U.S. 387, 403, 97 S.Ct. 1232, 1241–42, 51 L.Ed.2d 424 (1977) (citing *Brown v. Allen,* 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953) (Frankfurter, J., concurring).

Under this traditional analysis, federal courts had examined at length questions concerning a prisoner's state of mind, especially a defendant's competency to stand trial. Most courts found the ultimate question of whether a defendant is competent to stand trial to be at least a mixed question of law and fact. *See Drope v. Missouri,* 420 U.S. 162, 174–175 n. 10, 95 S.Ct. 896, 905–06 n. 10, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 385–386, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966); *White v. Estelle,* 459 U.S. 1118, 103 S.Ct. 757, 74 L.Ed.2d 973 (1983) (Marshall, J., dissenting from denial of certiorari). Accordingly, these courts did not attach a presumption of correctness to the state court's finding.

In 1982, the Supreme Court altered the foundation upon which these decisions rested. In *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (*Sumner II*), the Supreme Court implied that the presumption of correctness may apply in part to mixed questions of law and fact. The Court initially noted that the "ultimate question as to the constitutionality of the pretrial identification procedures used in this case is a mixed question of law and fact that is *not* governed by § 2254(d)." *Id.* at 597, 102 S.Ct. at 1306–07. Accordingly, the Court emphasized that a federal court could give "different weight to the facts and reach a different conclusion in light of the legal standard." *Id.* The Court, however, qualified this finding. The Court held that the "questions of fact that underlie this ultimate conclusion are governed by the statutory presumption." [9] *Id.* The federal courts, therefore, were instructed to "face up" to any disagreement as to the facts and to defer to the state court unless one of the factors listed in § 2254(d) applied. *Id.*

Shortly after *Sumner II,* the Supreme Court applied the statutory presumption to a question of competency. *See Maggio v. Fulford,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983). The *Maggio* majority concentrated upon the Louisiana trial judge's factual conclusions that supported his finding the defendant competent to stand trial. *Id.* at 117, 103 S.Ct. at 2264. The Court noted that these factual findings could not be overturned unless one of the eight conditions in § 2254(d) was satisfied. *Id.*

Four justices in *Maggio* expressed disapproval. They collectively believed the *Maggio* majority was overruling the line of cases that traditionally found issues of competency to be mixed questions of law and fact, to which § 2254(d) was inapplicable. *Id.* at 118–119, 103 S.Ct. at 2264–2265 (White, J., concurring), at 120, 103 S.Ct. at 2265–2266 (Brennan, J., dissenting), at 120–121, 103 S.Ct. at 2265–2266 (Marshall, J., dissenting).

U.S. 111, 113–118, 103 S.Ct. 2261, 2262–2265, 76 L.Ed.2d 794 (1983); juror bias, *see Patton v. Yount,* 467 U.S. 1025, 1034–40, 104 S.Ct. 2885, 2890–93, 81 L.Ed.2d 847 (1984); juror's exclusion for cause in a capital case, *see Wainwright v. Witt,* 469 U.S. 412, 426–29, 105 S.Ct. 844, 853–55, 83 L.Ed.2d 841 (1985).

9. The Court found several factual determinations to give rise to the presumption. These were (1) whether the witnesses had an opportunity to observe the crime or were too distant; (2) whether the witnesses gave a detailed accurate description; (3) whether the witnesses were under pressure from prison officials or others. The Court believed the trial judge necessarily considered these factual issues when deciding whether the pretrial identification procedure was unnecessarily suggestive. *Sumner II,* 455 U.S. at 597, 102 S.Ct. at 1306–07.

Trial courts have had difficulty in following the teachings of *Maggio* lead to a great deal of confusion in the lower courts. Courts were uncertain over whether to read *Maggio* as meaning that competency was a question of fact or as consistent with *Sumner II.*

In *Price v. Wainwright,* 759 F.2d 1549, 1551 (11th Cir.1985), the Eleventh Circuit adopted the harmonization approached. The *Price* court considered competency to stand trial to be a mixed question of law and fact. The court read *Maggio* as requiring a federal habeas court to separate the law question from the fact question. *Id.* at 1551 (citing *Strickland v. Francis,* 738 F.2d 1542, 1551 n. 16 (11th Cir.1984)). The court determined that the legal portion was the appropriate legal standard and the factual aspect was "whether the defendant knows or is able to do what is required by law." *Id.* at 1552. The court then noted that *"Maggio v. Fulford* should be read to require the application of § 2254(d)'s presumption of correctness to a state court's findings of underlying historical facts in a competency issue." *Id.* The *Price* court specifically noted, however, that the ultimate decision of competency was reviewable to the extent that a principle of law is involved. *Id.* The *Price* analysis is compatable with that of *Sumner II.*

The Supreme Court in its recent decision in *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), helped to ease this confusion by establishing a new methodology for determining whether the statutory presumption is applicable. The Court acknowledged that it "has not charted an entirely clear course in this area." *Id.* 106 S.Ct. at 451. The Court stated with certainty that "an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional challenge." *Id.* Nonetheless, the Court admitted that no "rule or principle [has been developed] that will unerringly distinguish a factual finding from a legal conclusion." *Id.*

The *Miller* court noted that the court's difficulty in this area "stems from the practical truth that the decision to label an issue a question of fact, a question of law, or a mixed question ... is sometimes as much a matter of allocation as it is of analysis." *Id.* 106 S.Ct. at 452 (citing Monaghan, Constitutional Fact Review, 85 Colum.L.Rev. 229, 237 (1985)). For the first time, the Court emphasized the implicit reasons for its prior determinations. The Court noted that when an issues "falls somewhere between a pristine legal standard and a simple historical fact," the fact/law distinction was often premised upon the determination that "as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id.* 106 S.Ct. at 452. On the other hand, when "the relevant legal principle can be given meaning only through its application to the particular circumstances of a case," the Court has termed the question one of law, justifying independent federal review. *Id.*

The *Miller* Court also indicated other factors that often lead to the extension of deference to the trial court. The Court noted that if an issue involves the credibility of witnesses and determinations of demeanor, "there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determination presumptive weight." *Id.*

The *Miller* Court then examined a few of its recent holdings, including *Maggio v. Fulford,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983), in light of this analysis. The *Miller* Court noted that the presumption of correctness was often afforded when, as in *Maggio,* "assessments of credibility and demeanor" are critical to the "proper resolution of the ultimate issue." Accordingly, competency questions are entitled to the presumption.[10]

10. *Miller* did not concern competency, but rather the voluntariness of a confession. The Court noted that certain factual questions necessarily needed to be resolved. These were "subsidiary questions:" length and circumstances of the interrogation, and the defendant's prior experience and familiarity with both the legal profession and *Miranda* warnings. *Miller,* 106 S.Ct. at 453. The Court noted these findings should be afforded the presumption. The Court noted, however, that once these factual issues have been resolved, the "moment comes" to deter-

The full ramifications of the *Miller* decision were brought to light in *Evans v. Raines*, 800 F.2d 884 (9th Cir.1986). *Evans* concerned a competency issue: the mental state required to waive the right to counsel. *Id.* at 886. The court began its analysis by characterizing the issue as a mixed question of law and fact. *Id.* The court noted, however, that this was no longer the determinative analysis.

The *Evans* court believed that the mere fact that a finding determines an ultimate issue of mental capacity does not turn it into a conclusion of law. *Id.* The Ninth Circuit relied upon *Miller,* and noted that the fact/law characterization "often turns on 'a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.'" *Id.* (citing *Miller,* 106 S.Ct. at 452). In addition, the *Evans* court noted that findings based on credibility and demeanor are usually entitled to the presumption. *Id.*

The *Evans* court then concluded that the state court's finding of competency was entitled to the presumption. The court reasoned that competency determinations necessarily involve assessments of credibility and demeanor. *Id.* at 887 (citing *Miller,* 106 S.Ct. at 453). The Ninth Circuit believed competency to be the sort of determination that should be accorded deference "despite the fact that it may be a mixed question of law and fact." *Evans,* 800 F.2d at 887.

In a footnote, *Evans* placed *Miller* in its proper perspective. *Evans,* 800 F.2d at 887 n. 3. The Ninth Circuit distinguished *Price v. Wainwright,* 759 F.2d 1549 (11th Cir. 1985). *Price* considered competency to stand trial to be a mixed question of law and fact, to which the presumption of correctness only applies to the underlying factual conclusions. *Evans,* 800 F.2d at 887 n.

3 (citing *Price,* 759 F.2d at 1552). The *Evans* court found this inconsistent with *Miller.* *Evans* believed *Miller* limited a federal habeas court's review to a determination of whether the presumption applies. No independent review could be conducted thereafter, and the *Evans* court believed its determination that the presumption applied to the competency issue "dispose[d] entirely of the competency [question]." *Id.*

*Evans'* interpretation of *Miller* is quite proper. The purely theoretical characterization of an issue as a question of fact or a question of law or a mixed question is no longer dispositive of a § 2254(d) analysis. After *Miller,* practical considerations govern. A court should determine whether, as a matter of the sound administration of justice, one judicial actor is in a better situation to apply historical facts to a "pristine" legal standard. When credibility of witnesses, and, hence, evaluations of their demeanor are necessary to apply law to fact, the presumption applies.

Under this analytical framework, the competency hearing before Judge Fagan is entitled to the statutory presumption. A determination of competency involves the attachment of weight to various types of evidence, all pursuant to a preordained legal standard. To determine the particular emphasis to attach to a piece of evidence, a trial judge must evaluate the witnesses' credibility. This necessarily implies a determination of their demeanor. With these considerations, Judge Fagan was in a better position that this court (without itself conducting a hearing) to determine Martin's competency to be executed.[11] Accordingly, Judge Fagan's finding is entitled to a presumption of correctness unless Martin can establish one of the eight exceptions listed in §. 2254(d).[12]

mine whether, under the totality of the circumstances, the confession was obtained in an unconstitutional manner. *Id.* at 453. With respect to this overall determination, "the state court judge is not in an appreciably better position than the federal habeas court to make that determination." *Id.* Accordingly, the *Miller* court found the state court's determination regarding voluntariness of the confession not to be entitled to § 2254(d)'s presumption.

11. This reasoning is universally applicable to all competency determinations, whether at the time of the offense, at the trial, or at the time of prescribed punishment. As these situations require similar findings by a state trial judge.

12. The presumption of correctness doctrine does not apply to the *Hitchcock, Sandstrom,* and *Strickland* claims.

2. The exceptions of § 2254(d) are applicable.

The court now examines whether any of the exceptions to § 2254(d) apply. Martin contends that the proceeding before Judge Fagan was fundamentally unfair because Judge Fagan did not gave Martin notice that the hearing was evidentiary, thereby negating Martin's efforts to present witnesses. Martin believes Congress did not intend to give a presumption of correctness to such a biased proceeding. Martin, therefore, contends that the proceeding before Judge Fagan fits within § 2254(d)(2), (6), and (7), arguing that both the factfinding procedure and the hearing were not fair and violated due process principles.

 Because the proceeding before Judge Fagan did not comport with traditional notions of fair play and substantial justice, the competency proceeding cannot be entitled to a presumption of correctness. The court reaches this conclusion through examining the procedural requirements established in *Ford* and analyzing traditional due process concepts in this context.

*Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), is a precedential quagmire. Four separate opinions considered two issues, often under differing analysis. The first question was whether a condemned prisoner has an eighth amendment right not to be executed while insane. The second inquiry concerned the procedural safeguards that are required to protect this right. A plurality of seven justices found that the prisoner had a right not to be executed while insane (although for discording reasons), and that the Florida procedures for determining sanity were wholly inadequate under the fourteenth amendment.

Three of the four opinions in *Ford* addressed the procedural requirements required under the due process clause. Because each of these opinions is markedly different, an extensive review of each is required.

Justice Marshall found three deficiencies in the pre-*Ford* Florida procedures designed to determine competency to be executed. The first inadequacy was that the prisoner was not involved in the truth-seek-

ing process. *Ford,* 106 S.Ct. at 2604. Marshall noted that in the capital punishment context the Supreme Court has consistently mandated that the states provide the defendant with every instance to present relevant information. *Id.* He saw no reason to depart from this established line of thinking, noting that " '[t]he minimum assurance that the life and death guess will be a truly informed guess requires respect for the basic ingredient of due process, namely an opportunity to be allowed to substantiate a claim before it is rejected.' " *Id.* (citing *Solesbee v. Balkcom,* 339 U.S. 9, 23, 70 S.Ct. 457, 464, 94 L.Ed 604 (1950) (Frankfurter, J., dissenting). Marshall found minimal due process to be absolutely necessary in this competency context for psychiatrists often disagree widely and frequently on what constitutes mental illness. *Id.*

Marshall's second deficiency in the pre-*Ford* Florida procedure was the denial of any opportunity for the prisoner to cross-examine the state's psychiatrists. Marshall believed that " '[c]ross-examination is beyond any doubt the greatest legal engine ever invented for the discovery of truth.' " *Id.* 106 S.Ct. at 2605 (citing 5 J. Wigmore Evidence § 1364 (Chadburne Edition 1974)). The cross-examination of the psychiatrists would greatly assist the process of seeking truth in sanity, for it would "bring to light" the grounds for the experts' beliefs. *Id.* This would assist the fact finder in making a choice between often inconsistent positions. *Id.*

Marshall's third deficiency—the placement of the decision of sanity within the executive branch—was for him the most striking. *Id.* Marshall noted that "the commander of the state's corps of prosecutors cannot be said to have the neutrality that is necessary for reliability in a fact-finding procedure." *Id.*

Although Marshall found these three deficiencies sufficient to strike down Florida's pre-*Ford* procedures, he refused to espouse with particularity the proper procedural requirements required by the due process clause. Marshall believed the states were best able to determine the ap-

propriate ways to enforce these constitutional protections. Marshall noted, however, that these procedures must follow "the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the fact-finding determination." *Id.* 106 S.Ct. at 2606. In addition, a state must assure that the "adversarial presentation of relevant information be as unrestricted as possible." *Id.*

To assist Florida in correcting its procedural deficiencies, Marshall did provide some guidance. In a footnote, Marshall noted that "instructive analogies may be found in the Florida procedures for determining whether a defendant is competent to stand trial or in the safeguard of Florida's insurers to those subjected to involuntary commitment." *Id.* 106 S.Ct. at 2606 n. 4. (citing Fla.Stat.Ann. § 916.11–916.12 (West 1985 and Supplement 1986) (competency to stand trial); Fla.Stat.Ann. § 394.467 (West Supplement 1986) (involuntary commitment proceedings)). Marshall found that although the parties' interests were different in these contexts, these inquests "share [the] common goal of reaching a fair assessment of the subject's mental state." *Id.* 106 S.Ct. at 2606 n. 4.

After considering the Florida statute upon which Justice Marshall relies, Marshall's position requires an evidentiary hearing whenever necessary. Under Fla. Stat.Ann. §§ 916.11–916.12, an evidentiary hearing is required to determine the competency of a defendant to stand trial if reasonable grounds exist to believe a defendant is incompetent. *See Walker v. State,* 384 So.2d 730 (Fla.App.1980). Similarly, under Fla.Stat. § 394.467(3)(a), a hearing is required to determine whether an incapacitated person is involuntarily placed in a mental health facility.

In contrast, Justice Powell would not go as far. Justice Powell noted that the requirements of § 2254(d) were equal to the protection afforded by procedural due process. *Id.* at 2609. Powell believed if the proceeding was in violation of due process, a presumption of correctness could not attach. Accordingly, Powell argued that the prisoner was entitled to a fair hearing, for this fundamental fairness is the hallmark

of the procedural protections afforded by the due process clause. *Id.* (citing *Lassiter v. Dept. of Social Services,* 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158–2159, 68 L.Ed. 2d 640 (1981)). For Powell, therefore, the determination of whether the presumption of correctness should apply is equivalent to determining whether due process was afforded.

Powell believed that at a minimum, due process required an opportunity to be heard. Because the Florida statute did not provide this opportunity to be heard, Powell found the procedure to be in violation of due process. *Id.*

Beyond this simple requirement, however, Powell believed not much else was required. He noted that due process was a flexible concept "requiring only 'such procedural protections as a particular situation demands.'" *Id.* 106 S.Ct. at 2610 (citing *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)). He noted that the condemned prisoner's eighth amendment right here arises only after a valid conviction of a capital crime and the imposition of a proper sentence of death. *Id.* Moreover, Powell noted that a state by now had already provided the prisoner with two previous chances to test his competency: the first at the time of the offense and the second at the time of trial. *Id.* Moreover, because the state had already provided two chances to prove the competency, Powell believed that the state could properly presume that the prisoner remained sane at the time the sentence is to be carried out. *Id.* 106 S.Ct. at 2610. Lastly, Powell noted that this determination of competency does not resemble the issues raised at trial or sentencing.

For Powell, the effect of these three factors negates the need for a full adversarial hearing. Because this right arises post-trial and post-sentence, the heightened procedural requirements for determining death in capital trials are inapposite. *Id.*

Accordingly, for Justice Powell, a constitutionally accepted procedure may be far less than a trial. *Id.* 106 S.Ct. at 2611. He noted that the state "should provide an impartial officer or board that receives evi-

dence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the state's own psychiatric examination." *Id.* Powell refused to delineate the precise scope beyond this requirement. He noted that so long as basic fairness was observed, he would find it consistent with due process. *Id.*

In further contrast to Justice Marshall's position, Justice O'Connor believed that not even this much was required under the due process clause. Justice O'Connor would not go any further than providing the condemned prisoner with minimal due process. *Id.* 106 S.Ct. at 2612. She considered it "self-evident" that once society "has validly convicted an individual of a crime and therefore established its right to punish the demands of due process are reduced accordingly." *Id.* Moreover, she noted that the potential for false claims and deliberate delay in this context were enormous. *Id.* The considerations, in her mind, lead to the conclusion that only minimal due process should be afforded. *Id.* 106 S.Ct. at 2613.

Although the Court reached no uniform agreement on the particular procedural requirements required by due process here, a majority of justices did, however, hold that due process demands a hearing at least once the prisoner has made some "threshold showing" that he has become insane after trial. *See Lowenfield v. Butler,* —— U.S. ——, ——, 108 S.Ct. 1456, 1457, 99 L.Ed.2d 686 (1988) (Brennan, J., dissenting from denial of stay). In essence, this "threshold" requirement is consistent with a traditional due process analysis.

In the traditional due process framework, three distinct factors are utilized to identify the specific dictates of due process. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The first factor is the private interests that will be affected by the official action. *Id.* The second consideration is the risk of erroneous deprivation of such interests to the procedures used and the probable value, if any, of additional or substitute procedural safeguards. *Id.* The third aspect is the government's interest, including the particular government function involved. *Id.*

In applying these factors, a federal court should be wary of other considerations. A court should be influenced by the extent to which a private person may be condemned to suffer a grievous loss. *See Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970) (citing *Joint Anti–Fascist Refugee Committee v. McGraff,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). A court should also focus upon whether the process due will promote the governmental interests in a particular situation. *Id.* 397 U.S. at 264, 90 S.Ct. at 1018–1019. This court now examines these considerations in this context.

The prisoner has one exclusive interest at stake in these competency hearings. This interest is the narrow right of forestalling the prisoner's execution "unless or until he recovers his sanity." *Ford v. Wainwright,* 106 S.Ct. at 2609 (Powell, J., concurring). This right entitles the prisoner not to a determination of whether he is to be executed, but when. *Id.* 106 S.Ct. at 2610. Of course, the prisoner's interest in avoiding an erroneous determination of when he is to be executed is very great. *Id.* at 2612 (O'Connor, J., concurring in result and dissenting in part).

The state's interests are more varied and detailed than those of the prisoner. The state has "a substantial and legitimate interest in taking the petitioner's life as punishment for his crime." *Id.* 106 S.Ct. at 2610 (Powell, J., concurring). The state has afforded the prisoner with a full trial as to liability and sentence, has given that prisoner all rights that naturally attach to this trial process, and has provided an appellate process to challenge the validity of the conviction. The state has also provided a collateral challenge to both the findings of liability and the imposition of the sentence. The state now also provides a procedure to further delay the sentence's imposition by affording the prisoner with another opportunity to determine his competency. Moreover, the state has specifically provided the petitioner with two prior instances to determine in some degree his mental capacity. In order to be convicted and sentenced, the prisoner must have been

judged competent to stand trial and found by the jury to be sane at the time the offense was committed. Given all these considerations, a state may, therefore, "properly presume that the prisoner remains sane at the time sentence is to be carried out." *Ford,* 106 S.Ct. at 2610 (Powell, J., concurring); *Ford,* 106 S.Ct. at 2612 (O'Connor, J., concurring in result and dissenting in part).

The particular finding required here differs substantially, both in type and practice, from those that are normally decided at the trial or sentencing level. A finding of competency to be executed is one not based entirely on historical fact, but basically subjective judgment. *Ford,* 106 S.Ct. at 2610 (Powell, J., concurring). The resolution of this question depends "substantially upon expert analysis in a discipline fraught with subtleties and nuances." *Id.* Moreover, unlike in a trial or sentencing situation, the particular question of competency can never be conclusively and finally determined. *Ford,* 106 S.Ct. at 2612 (O'Connor, J., concurring in result and dissenting in part). In theory, a prisoner can file an indefinite number of petitions seeking to have his competency determined. In each instance he would have to claim that since the previous determination, he had lost the capacity to be executed, if he was to obtain review of this issue. Accordingly, the potential for false claims and deliberate delay in this context is great.

■ Because of these considerations, due process requires that the particular procedure used must afford adequate protection to both the prisoner's and state's interests. The prisoner's interest here is great, and the potential of loss, if an erroneous determination is reached, is grave. Accordingly, the prisoner may have a right to an evidentiary hearing under appropriate circumstances but only if absolutely necessary to safeguard this right. The state's interest is also great, and, in fact, is entitled to presume that the prisoner is sane. A state has the right to avoid the inevitable harm that arises from false and misleading claims in this context. A state, therefore, should have the right to make the petitioner show by a substantial standard that he is incompetent before the

state is required to provide yet another evidentiary hearing. Moreover, the resolution of the question involved here need not depend upon the development of historical facts. Accordingly, some competency findings can be reached based on evidence submitted to a judge without the benefit of an evidentiary hearing.

The "threshold showing" requirement promulgated by a majority of justices, therefore, is consistent with a traditional due process analysis. This methodology protects the interests of both the state and prisoner, and is a fair process reasonably calculated to reach a correct result.

Justice Marshall's concerns of providing the petitioner an opportunity to rebut the state's claims of competency are adequately addressed. This procedure allows the petitioner the opportunity to make a showing that some type of doubt exists with respect to his competency. The process provides an opportunity for him to thoroughly challenge the state psychiatrists' viewpoints. The procedure is also in accordance with the viewpoints of Justices Powell and O'Connor, for the process provides a system in which the state's rights of administering punishment and avoiding further delay and expense are protected.

Although a majority of justices in *Ford* believed a state could require a threshold showing, they did not specifically define the threshold. Justice Marshall believed a state may require a "high threshold," and referred to the "sufficient doubt" standard espoused in *Pate v. Robinson,* 383 U.S. 375, 387, 86 S.Ct. 836, 843, 15 L.Ed.2d 815 (1966). *Ford,* 106 S.Ct. at 2606. Justice Powell argued that the state may require a "substantial threshold," citing the "significant factor" benchmark of *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed. 2d 53 (1985).

At oral argument, petitioner argued that the threshold standard should be one akin to the "genuine issue of material fact" standard of Fed.R.Civ.P. 56. The court finds this procedure inapplicable here. To the extent that Rule 56 is a constitutional requirement in the summary judgment area, the situation giving rise to this re-

quirement is completely different. At the summary judgment stage in a civil case, the nonmoving party has not yet been afforded an opportunity to present evidence or challenge the evidence presented by the other side or cross-examine witnesses; in essence, the traditional notions of a full trial. Accordingly, the burden upon the moving party is great: he must prove that no genuine issue of material fact exists with respect to any of these claims. By the time Martin raised this competency claim, he has been afforded a full trial, a complete appellate process, and an exhausting round of both state and federal collateral challenges.

Similarly, the requirements of due process here are less detailed than those required to determine the competency of a defendant to stand trial. *See Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966). In *Pate* the Supreme Court found that due process requires a hearing on competency to stand trial if "a sufficient doubt" of competency exists. *Id.* at 387, 86 S.Ct. at 843. The interests involved in the *Pate* context are different from the ones involved here. The state has an interest in trying the defendant it has probable cause to believe committed an offense. Pursuant to that end, it has provided the defendant with the opportunity to exercise his constitutional rights to a trial and to be represented by counsel. The defendant's interest is to assist his counsel in his defense. The balancing of these competing interests results in a standard that prevents the state from going through unnecessary and unworthy claims of incompetency, yet adequately assures the defendant that he will be afforded the full effect of his constitutional rights. In the present context, the right of competency exists by itself; that is, competency is not required to protect any of Martin's other constitutional rights.

This court believes the threshold standard is more synonymous with that espoused in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). *Ake* concerned whether an indigent defendant had a constitutional right of access to psy-

chiatric assistance to prepare for trial. *Id.* at 70, 105 S.Ct. at 1089–90. The *Ake* Court performed the traditional due process analysis proposed in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Court found the "interest of the individual in the outcome of the State's effort to overcome the presumption of innocence [to be] obvious." *Ake*, 470 U.S. at 78, 105 S.Ct. at 1093–94. The Court believed the state's interest in not providing a psychiatrist due to financial strain was not "substantial." *Id.* at 78–79, 105 S.Ct. at 1093–94. The Court also noted that the testimony of psychiatrists in the complex modern world to have a high probative value in a criminal trial where a defendant's mental state is in issue. *Id.* at 79–82, 105 S.Ct. at 1094–96. The Court then concluded that due process requires the appointment of a psychiatrist only after the defendant made an *"ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense." *Id.* at 82–83, 105 S.Ct. at 1095–96. The Court believed this process safeguarded the interests of both the state and defendant, for the defendant was provided with assistance when absolutely necessary and the state avoided the wasteful assistance for a nonmeritorious claim.[13] *Id.*

While the proper constitutional threshold may be close to that delineated in *Ake*, it is not exactly the same. Unlike the defendant Ake, who was presumed innocent, the prisoner here has been found guilty, and, moreover, is presumed sane. The state in this situation has already provided a full trial, a procedure that was not yet provided to Ake. These factors indicate that due process may allow a higher threshold showing than that explained in *Ake*.

Irrespective of the particular requirements for an evidentiary hearing here, the facts of *Evans v. McCotter*, 805 F.2d 1210, 1212–1213 (5th Cir.1986), provide an example of when an evidentiary hearing is not required under *Ford*. In *Evans*, the prisoner claimed he was incompetent and to support his claim filed an affidavit by his

---

**13.** Recently, in *Lowenfield*, Justices Brennan and Marshall indicated that Louisiana's "reasonable ground to doubt" threshold was appropri-

ate. *Lowenfield*, — U.S. at ——, 108 S.Ct. at 1456 (citing La.Code Crim.P. art. 643 (1981)).

sister alleging that he was insane. The state countered with affidavits of civil psychiatrists that showed he was competent to be executed. Because of this weak showing, an evidentiary hearing was not required. *Id.* at 1213–14.

Even though this case differs substantially from *Evans*, the court need not determine the precise parameters of the threshold requirement. Fla.R.Crim.P. 3.811 leaves the decision to hold an evidentiary hearing to the discretion of the trial judge. Of course, the trial judge could fail to exercise this discretion when due process requires an evidentiary hearing. That situation, however, is not before this court, for Judge Fagan exercised his discretion and decided to hold an evidentiary hearing.[14]

Although Judge Fagan made this decision because he felt fairness so required, the hearing he conducted was fundamentally unfair. Judge Fagan did not comply with the traditional requirements governing notice. *See Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). Moreover, the hearing's mechanics did not conform to the essential standards that form the basis of this country's adversarial system. For these reasons, Judge Fagan's finding reached after this hearing cannot be afforded the presumption of correctness.[15]

The notice aspect of due process is simply a right to be informed. *See Linsey v. Green*, 649 F.2d 425 (6th Cir.1981), *aff'd* 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982). At its very least, due process requires that notice be sufficient to inform someone of the pendency of an action. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). This alone, however, may not be sufficient, for notice must be sufficient to provide a person with a meaningful opportunity to be heard. *See Tulsa Professional Collection Services v. Pope*, —— U.S. ——, ——, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Accordingly, the particular notice that is required is dependent upon the nature of the proceeding. *See Ortiz v. Engelbrecht*, 61 F.R. D. 381, 388–389 (D.N.J.1973); *see also In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1103 (5th Cir.1977).

For this reason, the particular type of notice required differs from one situation to the next. In the bankruptcy context, the mere giving of notice that informs a creditor of the pendency of the action is insufficient. Under the bankruptcy law, a creditor has a set time in which to file a claim. The sending of notice without informing the creditor of the time frame in which to file a claim violates fundamental fairness. *See Reliable Electric Co., Inc. v. Olson Construction Co.*, 726 F.2d 620 (10th Cir. 1984). In such a situation, the creditor would appear at the hearing, yet would not be provided with an opportunity to present his side, for his claim would be time-barred.

**14.** The record reflects that Judge Fagan's decision to have an evidentiary hearing was a sound one. The record reflects that a more than insignificant doubt existed as to whether Martin's mental state satisfied § 922.07's requirements. The transcript of the prison interview indicates the fairness of judicially testing the opinions of the state psychiatrists regarding competency. Martin told these state doctors that he believed that certain "rulers of us" were in the room. Prison Interview Transcript at pp. 1–13. These remarks of Martin raise some doubt especially when the state's written report does not provide any reasons for its decision. Moreover, Dr. Lewis, Martin's psychiatrist, concluded that Martin suffered from paranoid schizophrenia, and a fixed delusional system. In addition, a neurological assessment indicated that Martin may suffer from brain damage. Dr. Halleck, whose credentials Judge Fagan found to be impressive, believed the state psychiatrists' conclu-

sions had no scientific validity. None of these factors alone are conclusive, of course, but they do indicate that an evidentiary hearing should have been held to try to resolve the conflict.

**15.** This court rejects the state's argument that Judge Fagan relied on the papers before him, and not the testimony of Dr. Mhatre, in making his finding. Judge Fagan found Dr. Mhatre's testimony "more persuasive" on the issue of competency. Fagan Transcript at p. 90. The state's belief, therefore, that due process was satisfied because Judge Fagan ruled on the filings of both sides is not supported by the record.

Similarly, the state's argument that Martin's competency was previously determined at trial is without merit. The issue here is whether Martin is currently competent. This determination must be made irrespective of prior rulings.

Accordingly, notice in the bankruptcy area has included information concerning the pendency of the action and the time and manner to file claims. *Id.* at 622. A similar detailed notice is required for juvenile proceedings. *See In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). A juvenile has a right to notice of the charges against him. *Id.* at 31–34, 87 S.Ct. 1445–1447. The court found that in this context, one of the purposes of notice is to "clarify the issues to be considered." *Id.* at 34 n. 54, 87 S.Ct. at 1446–1447, n. 54.

The notice provided by Judge Fagan in this instance violated fundamental fairness. Fla.R.Crim.P. 3.811 allows the trial judge to determine whether an evidentiary hearing is necessary. Judge Fagan never beforehand informed Martin of the nature of the proceeding; in fact, Judge Fagan only decided that the hearing was to be an evidentiary one when the hearing began. In this context where an evidentiary hearing is within the discretion of a trial judge, fundamental fairness requires that the judge inform the litigants of the nature of the proceeding. A contrary view would be a disservice to the excellent realizations raised by Justice Barkett in her dissent in *Martin v. State*, 515 So.2d 189, 192 (Fla. 1987). She noted that without this notice, petitioner's counsel "must bring all of his witnesses regardless of whether they will testify." *Id.* at 192. She believed this would be a wasteful expenditure that may be the responsibility of the state, who often provides the financing for the collateral challenge. *Id.* Moreover, such a squandering viewpoint would defeat the services that volunteering law firms provide in these collateral challenges, for if an attorney brings all his witnesses to a hearing and none testify, the state may well refuse to reimburse the expense. *Id.* This cost, therefore, would have to be absorbed by the volunteering firm, which would deter that firm from further collateral participation. *Id.*

At the hearing itself, Judge Fagan again treated Martin unfairly. Judge Fagan himself called the state's psychiatrist as a witness and did not provide a realistic opportunity for Martin to present evidence on his own.

Recently, Justices Brennan and Marshall found a district court's utilization of a procedure very similar to that used by Judge Fagan to be afoul of the due process clause. In *Lowenfield v. Butler*, — U.S. —, 108 S.Ct. 1456, 99 L.Ed.2d 686 (1988) (Brennan, J., dissenting from denial of stay of execution) (Justice Brennan's opinion was joined by Justice Marshall; Justices Stevens and Blackmun also dissented from the denial of the stay). The prisoner had challenged his competency to be executed. In less than a day, the Louisiana trial court and the Louisiana Supreme Court found him competent to be executed even though the only evidence presented was a psychiatrist's affidavit that indicated the prisoner was incompetent.

After the Louisiana Supreme Court's ruling and before the prisoner's federal habeas petition was filed, the district court conducted an extended, *ex parte* conversation with this psychiatrist. *Id.* 108 S.Ct. at 1457. The district court did not afford either counsel the opportunity to present any other evidence. From its "extended conversation" with the psychiatrist, the district court found the prisoner competent to be executed. *Id.*

Justice Brennan noted the inherent injustice in this unusual proceeding. He found that due process means little "if it requires the courts to provide 'an opportunity to be heard' ... without imposing on them a concomitant duty to listen—and at least when a life is at stake to listen very carefully." *Id.* 108 S.Ct. at 1458. He further noted that this *ex parte* examination was functionally equivalent to a policy of excluding advocacy on the part of the condemned, which is patently unconstitutional. *Id.* 108 S.Ct. at 1457.

The circumstances of *Lowenfield* are very similar to those here. Judge Fagan *called* the state psychiatrist who had found Martin competent as a quasi-court witness. Although he permitted both sides to examine this witness, he did not allow Martin to present any planned witnesses (many of whom were out of Florida) to refute the state doctor's testimony. Judge Fagan could have stayed these proceedings, if even for a day, so that Martin would round

up his witnesses and bring them to court. His belief that time was of the essence was unfounded, for he was acting under a stay of execution entered by the Florida Supreme Court.

Moreover, Judge Fagan's fact-finding procedure was unjust and fundamentally unfair, and, therefore, was not in accord with due process. Judge Fagan did not personally observe Martin's psychiatrists, whose written opinions were submitted with the initial filings. Nonetheless, Judge Fagan decided to discredit these opinions. Judge Fagan stated that he "discounted considerably the conclusions reached by Dr. Lewis, one of Martin's psychiatrists. Fagen Transcript at p. 91. He had "never before in [his] life seen one who is supposed to be an objective observer, especially when examining one's mental state, who displayed more of an advocate's role than that displayed by Dr. Lewis." Fagan Transcript at 89–90. He believed that much of what she did at the prison interview with Martin was an attempt to buttress conclusions that she had before she ever began. Fagan Transcript at p. 91. He specifically commented upon Dr. Lewis' purported demeanor, stating that "she even was anxious to make sure that the record documented her observations in order that her partisan attitude would be supported when brought up for review." Fagan Transcript at p. 91.

Judge Fagan also noted why he believed the two government witnesses who did not appear were credible. He stated that he observed nothing more than "pure objectivity" on their part in the prison interview. Fagan Transcript at p. 91.

Judge Fagan's determinations of the credibility of the witnesses who did not appear before him was a clear violation of Martin's due process rights. The trier of fact "is the sole judge of the credibility of a witness" who has testified and was cross-examined in a hearing before the fact finder. *See California v. Green,* 399 U.S. 149, 198, 90 S.Ct. 1930, 1956, 26 L.Ed.2d 489 (1970) (Brennan, J., dissenting); *see also Louis v. Blackburn,* 630 F.2d 1105, 1110 (5th Cir.1980). No determination of credibility is possible "when the witness comes before the trial fact finder by the reading of a cold transcript." *Green,* 399 U.S. at 198, 90 S.Ct. at 1956. In finding that Dr. Lewis acted as an advocate and was "anxious" in finding that the state's two psychiatrists were not objective, Judge Fagan made a determination of credibility upon the reading of a cold transcript. This was a violation of Martin's due process rights.

This analysis indicates that Martin was denied a hearing that was fundamentally fair as required by the dictates of the due process clause of the fourteenth amendment.[16] Accordingly, the proceeding before Judge Fagan cannot be given a presumption of correctness under 28 U.S.C. § 2254(d). This court now determines whether an evidentiary hearing is required to resolve this competency issue.

3. Under *Townsend* an evidentiary hearing is necessary.

■ The mere fact that the presumption of correctness is overcome does not necessarily mean that an evidentiary hearing is required. 28 U.S.C. § 2254(d) did not codify *Townsend,* and, therefore, does not address the issue of whether an evidentiary hearing is required. *See* Robbins, *Whither (or Wither) Habeas Corpus?: Observations of the Supreme Court's 1985 Term,* 111 F.R.D. 265, 275 n. 88 (1986). *Townsend* still determines whether an evidentiary hearing is required, and section 2254(d) is the provision that governs the burden of proof should an evidentiary hearing occur. *Id.; see also Richmond v. Ricketts,* 774 F.2d 957, 961–62 (9th Cir.1985); *In re*

---

**16.** While the record may indicate that Judge Fagan gave undue influence to the governor's determination, the court finds that Judge Fagan did not so defer. If he did, of course, this would violate the principles argued both by Justice Marshall and Justice Powell. Judge Fagan did state that he was prepared to find Martin competent based on his reading of the materials submitted to him, Fagan Transcript at p. 90, and did give great weight to the state psychiatrists who did not testify. Fagan Transcript at p. 91. Nonetheless, Judge Fagan stated he would not give undue deference, Fagan Transcript at p. 3, and did consider, albeit in a limited manner, the arguments of Martin's counsel. These considerations are in sharp contrast to the facts in *Ford,* where the prisoner had no opportunity to present argument, let alone evidence.

*Wainwright,* 678 F.2d 951, 952–53 (11th Cir.1982).

*Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), governs a federal court's decision on whether to hold a federal habeas evidentiary hearing. *Townsend* concerned the circumstances wherein an evidentiary hearing on a habeas petition was mandatory. *Townsend,* 372 U.S. at 312, 83 S.Ct. at 756–757. In holding that the district court should have afforded Townsend an evidentiary hearing, the Supreme Court formulated a six circumstance test to determine when an evidentiary hearing is required.

Chief Justice Warren began the Court's analysis by reviewing the broad power a federal court has in reviewing a habeas petition. The Court found the intent of Congress in passing the Habeas Corpus Act of 1867 was to "plainly design" a method to afford a trial-type proceeding in federal court for state prisoners aggrieved by unconstitutional detentions. *Id.* at 311, 83 S.Ct. at 756. The Court believed this was a proper procedure to "safeguard the liberty of all persons within the jurisdiction of the United States against infringement through any violation of the Constitution." *Id.* (citing *Hawk v. Olson,* 326 U.S. 271, 274, 66 S.Ct. 116, 118, 90 L.Ed. 61 (1945)). The Court noted that because illegal detentions are intolerable, "the opportunity for redress which presupposes the opportunity to be heard and to present evidence must never be totally foreclosed." *Id.* 372 U.S. at 312, 83 S.Ct. at 756–757 (citing *Frank v. Mangum,* 237 U.S. 309, 345–350, 35 S.Ct. 582, 594–596, 59 L.Ed. 969 (1915)) (Holmes, J., dissenting). With these considerations, the Court concluded that a federal evidentiary hearing is required "unless the state court trier of fact has, after a full hearing, reliably found the relevant facts." *Id.* 372 U.S. at 312–313, 83 S.Ct. at 756–757. The Court noted that the state could provide this "full hearing," either at the criminal trial or a subsequent collateral proceeding. *Id.*

To provide some guidance to the federal district courts, the Court formulated six circumstances where a federal evidentiary hearing on a habeas petition is mandatory. These circumstances are:

(1) The merits of the factual dispute were not resolved at the state hearing;

(2) The state factual determination is not fairly supported by the record as a whole;

(3) The fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;

(4) There is substantial allegation of newly-discovered evidence;

(5) The material facts were not adequately developed at the state court hearing;

(6) For any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313, 83 S.Ct. at 757.

As with all of its theoretical tests, the Supreme Court was worried that the district courts would use these six factors to thoroughly impinge upon the state criminal justice system. The Court believed that not only would the promiscuous grant of evidentiary hearings on habeas corpus petitions swamp the dockets of the district court, but it also would cause acute and unnecessary frictions with the state "organs of justice" as well. *Id.* at 319, 83 S.Ct. at 760.

To help ease this friction, the Supreme Court noted some limitations on this test. *Id.* at 318–319, 83 S.Ct. at 759–760. The court noted that in cases not falling within these six instances, the holding of an evidentiary hearing is within the discretion of the district judge. *Id.* at 318, 83 S.Ct. at 759–760. The Court found that if the district judge concludes that a habeas applicant was afforded a full and fair hearing by the state court, resulting in reasonable findings, a district judge "may, an ordinarily should, accept the facts as found in the hearing." With this guidance, the Court concluded that "there is every reason to be confident that the federal district judges, mindful of the delicate role in the maintenance of proper federal/state relations, will not abuse this discretion." *Id.* at 318, 83 S.Ct. at 759–760.[17]

---

17. Obviously, § 2254(d) changed some of this ruling. A district court no longer "should ac-

Accordingly, if the particular state proceeding falls within one of the six *Townsend* criteria, a district court must hold an evidentiary hearing. In this case, the fact-finding procedure utilized by Judge Fagan was not adequate to afford a full and fair hearing. Under the dictates of *Townsend*, therefore, an evidentiary hearing is required.

4. The meaning of insanity under the eighth amendment.

▇ The subject of this evidentiary hearing is Martin's competency to be executed. Because this is an independent review of this question in light of *Ford*, the standards established in Fla.Stat.Ann. § 922.07 are inapplicable. This court, therefore, must determine the meaning of competency under the eighth amendment. To do so, the court will review the several viewpoints of the *Ford* Court, examine these viewpoints in light of the constitutionally permissible policies supporting capital punishment, and compare the meaning of competency here with others in criminal law.

The court begins by reviewing the first issue addressed in *Ford:* the right of the defendant not to be executed while insane. In the plurality opinion of Justice Marshall, the concurring opinions of Justices Powell and O'Connor, and the dissent of Justice Rehnquist, this issue was addressed. Because these positions varied greatly, an extensive examination of each is required.

Justice Marshall, in writing for three other justices, found that the eighth amendment prohibits the state from inflicting the penalty of death upon a prisoner who is insane. *Ford v. Wainwright*, 106 S.Ct. at 2602. Justice Marshall premised this conclusion upon his belief that the eighth amendment prescribes two kinds of historical punishment. He first noted that the eighth amendment's ban on cruel and unusual punishment "embraces, at a minimum, those modes or acts of punishment that had been considered cruel and unusual at the time the Bill of Rights was adopted."

*Ford v. Wainwright*, 106 S.Ct. at 2600 (quoting *Solem v. Helm*, 463 U.S. 277, 285–286, 103 S.Ct. 3001, 3007, 77 L.Ed.2d 637 (1983)). Marshall then commented that the eighth amendment not only prohibits those practices condemned by the common law in 1789, but "also recognizes the 'evolving standards of decency that mark the progress of maturing society.'" *Id.* at 2600 (citing *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Justice Marshall then conducted a twofold analysis, first concentrating on those acts banned in 1789 and then considering "evidence of contemporary values." *Id.*

Marshall noted that under the common law, the bar against executing the prisoner who had lost his sanity was long established. In Marshall's viewpoint, the practice "consistently has been branded 'savage and inhumane.'" *Ford v. Wainwright*, 106 S.Ct. at 2600 (citing 4 W. Blackstone, Commentaries, 24–25 (1769)). Justice Marshall found other reasons in the common law. He found that Sir Edwin Coke noted that the execution of an insane person provides "no example to others and thus contributes nothing to what deterence value is intended to be served by capital punishment." E. Coke, Third Institute 6 (6th Ed.1680). Marshall also found a long history of religious reasons for this rule. *Ford v. Wainwright*, 106 S.Ct. at 2601 (citing Hawles' Remarks on the Trial of Mr. Charles Bateman (1685), 11 How.St.Tr. 474, 477 (1816)). Justice Marshall also noted that under the common law, the doctrine of *furiosus solo furore punitur* (madness is its own punishment) applies. *Ford v. Wainwright*, 106 S.Ct. at 2601 (citing Blackstone, Commentaries at 395).

Justice Marshall next found that this common law rule has uniform acceptance in the United States today. Marshall believed recent commentators consider the execution of the insane as discrediting the death penalty. *Id.* 106 S.Ct. at 2601. In a footnote, he noted that of the 41 states

cept the facts" found in a full and fair hearing; a district court now *must* attach a presumption of correctness.

having the death penalty, 26 have statutes specifically requiring the suspension of execution of a prisoner who meets the legal test for incompetence. *Ford v. Wainwright*, 106 S.Ct. at 2601 n. 2. Marshall, therefore, found that "the various reasons put forth in support of the common law restriction have no less logical, moral and practical force than they did when first voiced." *Ford v. Wainwright*, 106 S.Ct. at 2602. Marshall continued: "For today, no less than before we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life." *Ford v. Wainwright*, 106 S.Ct. at 2602 (citing Note, The Eighth Amendment and The Execution Of The Presently Incompetent, 32 Stan.L.Rev. 765, 777 n. 58 (1980)). Marshall further commented that "the natural abhorence of civilized societies at killing one who has no capacity to come to grips with his own conscience or diety is still valid today." *Ford v. Wainwright*, 106 S.Ct. at 2602.

Justice Marshall then summarized his two-prong reasoning. He stated: "Whether it's aim be to protect the condemned from fear and pain without comfort of understanding or to protect the dignity of society from the barbarity of exacting mindless vengence, the restriction finds enforcement in the eighth amendment." *Id.*

Justice Powell, in essence, agreed with Justice Marshall. He relied on *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and noted "that while the framers 'may have intended the eighth amendment to go beyond the scope of its English counterpart, their use of the language of the English Bill of Rights is convincing proof that they intended to provide at least the same protection.'" *Ford v. Wainwright*, 106 S.Ct. at 2606 (citing *Solem v. Helm*, 463 U.S. at 286, 103 S.Ct. at 3007)).

Justice Powell wrote separately, however, to address the meaning of insanity, "a pivotal concept carefully avoided by the majority." *See* Note, Leading Cases: Death Penalty and The Execution Of The Insane, 100 Harv.L.Rev. 100, 103 (1986). Justice Powell noted that the bounds of insanity with respect to the eighth amendment "are necessarily governed by federal constitutional law." *Ford v. Wainwright*, 106 S.Ct. at 2607. Powell noted "that executions of the insane both impose a uniquely cruel penalty and are inconsistent with one of the chief purposes [of the death penalty]." *Id.* 106 S.Ct. at 2608. For this reason, Powell believed that no one "disputes the need to require that those who are executed know the fact of their impending execution and the reason for it." *Id.* Accordingly, Powell found that such a standard should define the kind of mental deficiency that triggers the eighth amendment prohibition. *Id.*

Justice Powell then tried to give some substance to this reasoning. He noted that "if the defendant perceives the connection between his crime and his punishment, the retributive goal of criminal law is satisfied." *Id.* 106 S.Ct. at 2608–09. In addition, Justice Powell believed that the defendant can only prepare himself for passing if he is aware that his death is approaching. *Id.* 106 S.Ct. at 2609. Justice Powell then proposed this meaning of insanity: "I would hold that the eighth amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* 106 S.Ct. at 2609.

Justice O'Connor rejected the conclusion that the eighth amendment forbids the execution of the insane. *Ford v. Wainwright*, 106 S.Ct. at 2611–13. She concurred in the result that the defendant should not be executed because she believed Florida positive law created a protective liberty interest of avoiding execution in an incompetent prisoner. *Id.* 106 S.Ct. at 2611. She noted that this liberty interest protected by the fourteenth amendment arises from two sources: the due process clause and the laws of the state. Justice O'Connor believed that the due process clause did not create a protected interest in avoiding the execution of a death sentence during incompetency. *Id.* (citing *Solesbee v. Balkcom*, 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604 (1950)). Justice O'Connor did find, however, that Florida law, largely espoused in Fla.Stat. § 922.07(3), did give the condemned prisoner a protected liberty inter-

est, for this section mandated that the governor to stay the execution of an incompetent person. *Id.* 106 S.Ct. at 2612.

This is the analysis that Justice Rehnquist used in his dissent. Justice Rehnquist found the court's holding that the eighth amendment prohibits a state from carrying out a lawfully imposed sentence of death upon an insane person to be unremarkable. *Id.* 106 S.Ct. at 2613. Justice Rehnquist believed the common law created no such right. *Id.* at 2614. Moreover, Justice Rehnquist rejected Justice O'Connor's finding that Florida positive law created a right in an insane prisoner not to be executed. *Id.* 106 S.Ct. at 2615. Justice Rehnquist believed Florida law created the right in a condemned prisoner only to have the governor determine if he is insane. *Id.*

With only five justices believing that the eighth amendment prohibits the execution of the insane, and only one of these justices determining the type of mental state actually protected by this right, *Ford* is of limited assistance here. This court must determine the true reach of this new eighth amendment right. To do so, this court will review the few decisions interpreting *Ford*, examine the social policies behind the death penalty, and formulate a definition that is consistent with that promulgated by Justice Powell.

Although the majority of courts interpreting *Ford* have concentrated on the procedural aspects of its ruling, *see, e.g., Evans v. McCotter*, 805 F.2d 1210, 1212–13 (5th Cir.1986), the courts that have focused upon the eighth amendment analysis have largely agreed with Justice Powell. In *Johnson v. Cabana*, 818 F.2d 333, 336 (5th Cir.1987), the court interpreted *Ford* as prohibiting the execution of a defendant who "could not perceive the connection between his crime and punishment." This is a direct quote from Justice Powell's concurrence. *See Ford*, 106 S.Ct. at 2608–2609.

The Supreme Court denied certiorari on the *Cabana* case. *See Johnson v. Cabana*, — U.S. ——, 107 S.Ct. 2207, 95 L.Ed.2d 861 (1987). Justices Brennan and Marshall dissented, and in so doing shed some light on the *Ford* opinion. For the first time, these justices who penned the plurality opinion interpreted *Ford* as holding that the eighth amendment bars execution of convicted prisoners found to be not only insane but incompetent. *Cabana*, 107 S.Ct. at 2207. Justices Brennan and Marshall then went on to adopt the mental state Justice Powell considered protected by the eighth amendment. *Id.* (citing *Ford*, 106 S.Ct. at 2608–2609).

While these cases may be persuasive on the point that the eighth amendment only protects a prisoner with the mental state espoused by Justice Powell, his view cannot be blindly accepted for it was far from majority acceptance. Some other indicia must be found to show that the Powell position is consistent with the eighth amendment. For this court, these indicators are the policies supporting the constitutionality of capital punishment.

At its bare minimum, the eighth amendment guarantees to a condemned prisoner that the state cannot enforce a capital sentence if to do so "does not 'measurably contribute' to one or both of the two social purposes which this court has accepted as justifications for the death penalty." *See Enmund v. Florida*, 458 U.S. 782, 799, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982); *see also Tison v. Arizona*, — U.S. —— 107 S.Ct. 1676, 1695–96, 95 L.Ed.2d 127 (1987) (Marshall, J., dissenting). The death penalty serves two principal social purposes: retribution and deterence of capital crimes by prospective offenders. *See Enmund v. Florida*, 458 U.S. at 798, 102 S.Ct. at 3377 (citing *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859 (1976)). Unless this connection exists, imposition of the death penalty " 'is nothing more than the purposeless and needless imposition of pain and suffering.' " *See Enmund*, 458 U.S. at 798, 102 S.Ct. at 3377 (citing *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977)).

The two purposes behind the death penalty were discussed in great detail in the Supreme Court's landmark decision in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The *Gregg* court first dealt with retribution. The Court believed that capital punishment "is

an expression of society's moral outrage at particulary offensive conduct." *Id.* 428 U.S. at 183, 96 S.Ct. at 2930. The Court found that capital punishment is essential in an ordered society because it allows citizens to rely on legal processes rather than self-help to vindicate their wrongs. *Id.* In support of this position, the *Gregg* Court noted that the instinct for retribution is part of the nature of man. The Court believed that channeling this instinct into the administration of criminal justice serves an important purpose in promoting the stability of society governed by law. *Id.* The court concluded that " 'when people begin to believe that organized society is unwilling or unable to impose upon a criminal defendant the punishment they 'deserve' then there are sown the seeds of anarchy—of self-help, vigilante justice and lynch law." *Id.* (quoting *Furman v. Georgia*, 408 U.S. 238, 308, 92 S.Ct. 2726, 2761, 33 L.Ed.2d 346 (1972)). The Court found this position to be consistent with our respect for the dignity of man, for capital punishment is nothing more than "an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." *Id.* 428 U.S. at 184, 96 S.Ct. at 2930.

The *Gregg* court then dealt with the deterence purpose. The court found that for many offenders "the death penalty undoubtedly is a significant deterrent." *Id.* 428 U.S. at 185–186, 96 S.Ct. at 2931. The court admitted its deterent effect for murderers who act in the act of passion is probably pretty little, but the effect for those carefully-contemplated murders, such as murder for hire, is probably great. *Id.* at 186, 96 S.Ct. at 2931.

Under this precedent, a state can only execute a condemned prisoner if it contributes to these goals. This court, therefore, must determine what type of mental state a prisoner must have so that his execution "measurably contributes" to these goals.[18]

The court first examines this question in light of the death penalty's retributive aspects. As the court stated in *Gregg*, the retributive purpose has two components. The first is the just desserts argument which is nothing more than society's belief in the eye-for-an-eye theory. The second is the channeling-of-anarchy proposition.

In order for the just-desserts theory to be fulfilled, a defendant must appreciate the connection between his crime and punishment. An essential part of the punishment society imposes on a defendant is to make the defendant realize and live with the concept that he will die for what he did. In many respects, the execution of a prisoner who does not have this appreciation is a lesser punishment than society intended to give. Accordingly, if retribution is to be served by the death of a condemned prisoner, the prisoner must at least have this realization. Under the previous analysis, therefore, if a prisoner does not have this realization, and the state executes him, the eighth amendment is violated.

The execution of a prisoner without this understanding also would do a disservice to the second aspect of retribution: the channeling of anarchy. At its heart, the channeling-of-anarchy theory advocates that the state, in an ordered, rational fashion, can administer the punishment society desires,

---

**18.** In resolving issues of this type, an economist is perhaps better situated than a federal judge. An economist could handle questions like this in the wonderful world of perfect competition. The court is not that lucky. Of course, if the court was a fortunate, it could situate itself behind a "veil of ignorance." J. Rawls, *A Theory of Justice* (Harvard Press 1971). Behind this veil, the court would "use the notion of pure procedural justice as a basis of theory." *Id.* at 136. The court would have no conception of the good, and would not understand its role within society. *Id.* at 137. All the court could construe is "that ... society is subject to the circumstances of justice and whatever this im-

plies." *Id.* Justice would "generate its own support." *Id.* at 138. Humans would "desire to act in accordance with [just] principles." *Id.* "The arbitrariness of the world [would] be corrected," and the court would reach the desired result. *Id.* at 141. The Rawls original position is an attractive situation. Unfortunately, this position does not include an individual like Nollie Lee Martin, who stabbed Patricia Greenfield only after his attempts to strangle her to death failed. Accordingly, the court will reach this issue fully cognizant of the fact that this eighth amendment right arises only after a human like Martin has been convicted of murder.

and, therefore, avoid the anarchy that would naturally arise if society itself haphazardly imposes discipline. The execution of a person who does not appreciate the connection between his crime and punishment is nothing more than an unrestrained act of violence. This punishment would defeat the administrative organization of justice that is at the heart of the channeling-of-anarchy theory. Administration of justice in this fashion "would make capital punishment look less like a guarantee of rational order and more like the instrument of terror and social catharsis that it is." Note, Leading Cases: *Ford v. Wainwright*, The Death Penalty and The Execution of Insane, 100 Harv.L.Rev. 100, 106 (1986).

If the defendant appreciated the connection between his crime and punishment, however, the state's imposition of the death penalty would be consistent with the desired punishment society would like to have imposed. The natural instinct of man and society for retribution would be administered in a organized fashion. The execution of a defendant with this state of mind serves the retributive purpose for the death penalty, and, therefore, is consistent with the eighth amendment.

Similar to this retributive purpose analysis, the execution of a prisoner without an appreciation of the connection between his crime and punishment would be a disservice to the deterrence aspect of capital punishment. The essence of this deterrence purpose is the rational concept that if you do this act society considers heinous you will be killed; that is, society will make you an example to others so that their acts conform to the accepted standards of humanity. The execution of a person who cannot appreciate the connection between his crime and punishment would be tantamount to an act of inhumanity. This violence would be the killing of a person who had no idea why the state was killing him.

This action would be nothing more than an efficacious function indictating that the state absolutely controls life and death within its borders. Such arbitrary, inhuman action would deter no one. Potential offenders would rationalize that the state may capriciously take my life anyway, so I might as well commit this offense.

If both purposes behind the death penalty are to be served, and, therefore, the sentence is to be carried out in accordance with the eighth amendment, the defendant must at least appreciate the connection between his crime and punishment. This appreciation consists of both a subjective and objective part. The subjective part is nothing more than the defendant's perception of the connection between his crime and punishment. A defendant must understand the fact he committed his crime and the fact that he will die at a specific time and place. A defendant must also understand the basic and fundamental logical proposition that because he has committed an act that society and all civilized humanity finds heinous he is to be killed.[19] The objective aspect of this realization test is relatively straightforward. This concept determines whether the defendant's subjective understanding is grounded in reality; that is, is rational.[20]

This appreciation of the connection between crime and punishment is very similar to Justice Powell's "perceives the connection" requirement. The terms "perception" and "appreciation" necessarily imply a similar understanding. Moreover, while appreciation and perception are inherently subjective terms, when an individual perceives or appreciates a cognitive connection between two factual concepts, a small objective understanding developes.

A possibility exists, however, that the appreciation test may not be fully consistent with all of Justice Powell's reasoning.

**19.** This test is somewhat limited. Whether the defendant believes his actions were wrong is irrelevant. The defendant must believe that society considers his actions improper.

**20.** At first, this concept may appear more psychological than philosophical, but that is not the case. This objective determination is fairly cut and dry. A court must determine whether the defendant's logic behind this connection is reasonable; that is, whether the defendant's rationale is consistent with the ordinary experience of human beings. In essence, a judge must sit as a jury would in a negligence action to determine whether the defendant's understanding is rational. As the court analysis indicates *infra*, a similar requirement exists in the *Dusky* context.

The perceive the connection phrasing is not the complete description of the Powell requirement. Powell believed that the eighth amendment forbids the execution of condemned prisoners who are unaware of the punishment they are about to suffer and why they are to suffer it. Justice Powell's use of the term "why" may imply that some sort of explanation is necessary in order to serve the purposes behind the eighth amendment. To serve the policies behind the death penalty, no explanation is necessary.[21] The defendant should only understand that he committed a crime that society finds offensive and because of it, he is to be punished by death. For eighth amendment purposes, the defendant is not entitled to a detailed explanation of death. Moreover, the defendant is not even entitled to an explanation as to why society (and, obviously, not himself) perceives the offense he committed to be heinous enough to deserve death as punishment. The court believes that Justice Powell's term "why" can be read to be consistent with these viewpoints, and, hence, the appreciation of the connection between the crime and punishment definition is very similar to Justice Powell's viewpoint.

This meaning of insanity is also consistent with the recent pronouncements of the American Bar Association concerning this topic. In August 1987 the ABA proposed some standards for the determination of competence to be executed. *See* American Bar Association, Criminal Justice Standards: Criminal Justice Mental Health Standards—Competence and Capital Punishment, Standard 7–5.6.(b) (August, 1987). The ABA noted that its proposed standards were selected "to reflect the substantive concern that individuals should not be executed when they lack the capacity for rational understanding of the nature of the proceedings or the penalty that is about to be imposed." *Id.* (Comment). To the extent that this rational understanding of the nature of the penalty requires a realistic

appreciation, the ABA standard conforms with the appreciation definition.

In many respects, the appreciation of the connection definition is very similar to the factual and rational understanding requirements that the Supreme Court established in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). In *Dusky*, the Supreme Court considered the competency to stand trial requirement of 18 U.S. C. § 4244. The court adopted the view put forth by the Solicitor General that it was not enough for the district judge to find that " 'defendant [is] oriented to time and place and [has] some recollection of events.' " *Id.* The court noted that the test should be "whether the [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.*

Much as the meaning of insanity here promotes the interest behind the eighth amendment in the capital punishment context, the test proposed in *Dusky* was designed to safeguard certain constitutional protections. The test insures that an incompetent person will not be tried, a prohibition that "is fundamental to an adversarial system of justice." *Drope v. Missouri,* 420 U.S. 162, 171–172, 95 S.Ct. 896, 903–904, 43 L.Ed.2d 103 (1975); *accord Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *Dix v. Newsome,* 584 F.Supp. 1052 (N.D.Ga.1984). In addition, the test proposed in *Dusky* protects "an accused's fifth and sixth amendment rights to a fair trial and effective assistance of counsel." *United States v. Swanson,* 572 F.2d 523, 526 (5th Cir.1978) (citing *Wilson v. United States,* 391 F.2d 460 (D.C.Cir.1968).

Because the *Dusky* standard was developed in a similar context, the definition's

---

**21.** The defendant cannot be entitled to such an explanation. Metaphysics is not sufficiently advanced to provide a satisfactory rationale. Moreover, a fundamental notion of justice prevents the defendant from receiving this reasoning. An ordinary person, who never possessed the tenacity to kill another human, may contact a fatal disease. This person will never understand why he is to die. In addition, Nollie Lee Martin never provided his victim with such an explanation. If the innocent person cannot receive this explanation, why should an individual who made a conscious decision to end another human's life?

particular components are somewhat comparable to those here. While the condemned prisoner need not .understand the nature of the collateral death penalty proceedings, the eighth amendment does require a limited factual understanding, which must be combined with an even more limited rational understanding.[22]

Because of these similarities, the judicial interpretations of the *Dusky* definition are of limited, but useful guidance to applying the appreciation standard. Of particular importance here are the decisions that attempt to define the term "rational" and that tie in the *Dusky* test with the science of psychology.

The courts that have interpreted the *Dusky* term "rationality" have done so in a similar manner as this court does today. "Rationality from a standpoint of competence is not determined by foolishness or wisdom." *Sweezy v. Garrison*, 554 F.Supp. 481, 492 (W.D.N.C.1982). In addition, a defendant's irrationality cannot be defined in terms of acting against his or her interests. The term "rationality" must not be devoid of common ordinary understanding. *See United States v. Blohm*, 579 F.Supp. 495, 499 (S.D.N.Y.1983). For this reason, courts have found that the rationality to be demonstrated "is that of an objective rationality what would be regarded as rational to the average person." *Id.* These authorities support the objective portion of the appreciation definition.

The courts that have interpreted *Dusky* are in uniform agreement that incompetency to stand trial is not defined in terms of mental illness. *See United States v. Zovluck*, 425 F.Supp. 719, 721 (S.D.N.Y.1977). For this reason, a defendant can be found incompetent to stand trial without being mentally ill. *Id.* Accordingly, psychiatric evaluations serve only as recommendations in making the final judgment. *Id.*

Moreover, courts have been careful to distinguish incompetency to stand trial from a mental illness that absolves the defendant of criminal liability. A defendant may be competent to stand trial even though he had a mental disease. That mental disease may have been the cause of his criminal act and he may still be suffering from the same disease does not necessarily mean that the defendant is incompetent to stand trial. *See Lee v. Alabama*, 386 F.2d 97, 110 (5th Cir.1967) (Bell, J., dissenting). The Fifth Circuit reached a similar result in *McCune v. Estelle*, 534 F.2d 611 (1976). In *McCune*, the defendant had a life-long history of severe mental deficiency and bizarre, volatile, irrational behavior. *Id.* at 612. Defendant had been adjudged feeble-minded and he consistently scored at very low levels on mental capacity tests. Nonetheless, the court held that low intelligence and weird behavior cannot be equated with incompetency to stand trial. *Id.; accord United States v. Hearst*, 412 F.Supp. 858, 859 (N.D.Cal.1975).

A court, however, need not thoroughly divorce itself from considering the defendant's mental condition. To adequately apply the *Dusky* standard, a court must thoroughly acquaint itself with the defendant's mental condition. *See United States v. Makris*, 535 F.2d 899, 907 (5th Cir.1976). Once a court obtains a medical description or classification of defendant's illness, it still has further work to do. *Id.* The court must analyze the medical and other evidence to arrive at a legal conclusion. *Id.*

These cases help define the scope of the eighth amendment protection afforded here. A defendant may be mentally ill and still be competent enough to be executed. A condemned prisoner need not have all mental faculties; the prisoner need only appreciate the connection between the

---

**22.** The court must specifically note that the *Dusky* standard is not fully consistent with the eighth amendment. The Supreme Court formulated the *Dusky* test to handle a situation where a defendant was not yet tried, much less convicted and sentenced. This defendant required a heightened mental awareness to assure that his constitutional rights were safeguarded. For example, a defendant awaiting trial must be able to assist his counsel in his defense, and

must be able to determine whether any of his constitutional rights should be waived. These concerns are completely absent for the properly condemned prisoner. The mental state required here only guarantees that the state utilize the death penalty pursuant to the policies promoting capital punishment. The mental state requirement here is not developed to perserve other constitutional rights.

crime and its punishment. Accordingly, a court should not limit its analysis to a determination of whether the defendant is mentally ill. For this reason, the Fifth Circuit has just recently held in two cases that an individual who was mentally retarded could be executed under the dictates of *Ford. See Penry v. Lynaugh*, 832 F.2d 915, 918 (5th Cir.1987); *Brogdon v. Butler*, 824 F.2d 338, 341 (5th Cir.1987).[23]

Accordingly, this definition of insanity will govern at the evidentiary hearing. Martin must show that he lacks an appreciation of the connection between his crime and punishment, as discussed above.

A separate order scheduling this hearing will be issued by the court.

The stay of execution previously entered November 10, 1987, be and the same is hereby continued in full force and effect until further order of this court.

---

**23.** As evidenced from the record, Florida did not apply properly the appreciation standard. Both Judge Fagan and the Florida Supreme Court claimed to have followed the standard espoused in Fla.Stat. § 922.07 (1987). This section defines competency as "does the defendant understand the nature and effect of the death penalty and why it is to be imposed upon him?" *Id.* While section 922.07's requirements are sufficient to satisfy the eighth amendment, the Florida courts applied section 922.07 in a constitutionally impermissible manner.

Section 922.07's requirements are sufficient to satisfy the dictates of the eighth amendment. As noted earlier, this definition, being very similar to that of Justice Powell, has the required subjective and objective components. If a Florida court found a condemned prisoner competent under this definition, the state could execute him without violating the eighth amendment.

Neither Judge Fagan nor the Florida Supreme Court, however, properly applied the statute. Judge Fagan found Martin competent because Fagan believed that Martin understood the nature and effect of the death penalty and why it was to be imposed upon him. Fagan Transcript at p. 88. He premised this finding only upon Martin's factual understanding. Judge Fagan did not determine whether Martin's under-

standing was grounded in reality. Fagan refused to consider whether *Dusky* had any relevance. Fagan Transcript at p. 90. He only noted that a rational understanding did not equal rational explanation. Fagan Transcript at p. 90. He did not further explain this conclusion, let alone apply it to the facts before him.

In *Martin v. State*, 515 So.2d 189, 190 (Fla. 1987), the Florida Supreme Court not only indicated that Fagan ruled based solely on a factual understanding, but found that this mental state was all that was required. The court noted that the evidence before Judge Fagan "clearly show[ed]" that Martin was competent. *Id.* The court made this finding even after assuming that Dr. Lewis' conclusions that Martin lacked a rational understanding were true. *Id.* In essence, the court found that any rational understanding was not required. Moreover, the court specifically held the *Dusky* standard inapplicable. *Id.* Accordingly, the court found the "mere *fact* that Martin believes that a satanic conspiracy resulted in his conviction does not override his understanding of why he is being executed." *Id.* (emphasis added). Such a statement indicates that the Florida Supreme Court believed only a factual understanding was necessary, for this belief of Martin may have some bearing on the objective aspect of the eighth amendment here.